Joseph MORRIS, et al.

v.

Anthony TRAVISONO, et al.

John CARILLO

v.

John J. MORAN, et al.

Civ. A. Nos. 4192 P, 77–0283 P.

United States District Court,
D. Rhode Island.

Oct. 12, 1982.

Robert B. Mann, Barbara Hurst, Asst. Public Defender, Providence, R.I., for plaintiffs.

George M. Cappello, Legal Counsel, Dept. of Corrections, Cranston, R.I., for defendants.

292

## OPINION AND ORDER

PETTINE, Senior District Judge.

Plaintiff John Carillo, an inmate at the Adult Correction Institutions (ACI), brings this action pursuant to 42 U.S.C. § 1983 for injunctive and declaratory relief, alleging that the conditions of his confinement are cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. The plaintiff has also requested that the Court hold the defendants in civil contempt for violating its August 1980 order.[1]

## I. FACTS

This case was first tried in December 1979 as a consolidated action. The plaintiff had filed a motion to adjudge the defendants in civil contempt for failing to adhere to the Morris Rules,[2] which had been adopted by the April 20, 1972 consent judgment and order of this Court. The plaintiff had also filed an independent civil rights complaint. In August 1980, the Court held that the defendants had violated the Morris Rules. *Morris v. Travisono,* 499 F.Supp. 149, 157–59 (D.R.I.1980). However, it declined to decide the eighth amendment issue presented in Carillo's civil rights complaint. Instead, the Court retained jurisdiction to decide this issue in the future. Carillo's continued solitary confinement, which has now lasted for more than eight years, makes consideration of his eighth amendment claim essential.

The history of the plaintiff's confinement in the ACI was set forth in this Court's prior opinion. *Morris v. Travisono,* 499 F.Supp. at 150–52. It is, therefore, unnecessary to repeat these findings at length. It is sufficient to note that during the six year period leading up to the original trial, the plaintiff was housed in some form of segregated confinement, spending 23 to 24 hours a day in his cell. *Id.* at 151. Carillo was denied all work, educational and vocational opportunities during this time period. He had only limited access to newspapers, magazines and other reading material. Finally, no rehabilitation and treatment program existed for Carillo, as required by the Morris Rules.

As a result of these findings, the Court ordered the defendants to devise a meaningful treatment plan for the plaintiff, classify him in accordance with the Morris Rules, and provide him with the privileges due a category "C" inmate. *Morris v. Travisono,* 499 F.Supp. at 157–59. In accordance with this order, the Classification Board of the ACI convened September 22, 1980, to reconsider the status of the plaintiff. After reviewing Carillo's files, evaluations by his counselor, several psychologists and the prison psychiatrist, the Board declined to reclassify him and reintegrate him into the general prison population. The Board concluded that Carillo is "a dangerous person" who represents a "high degree of risk" due to his "high propensity for continued violence and assaults on others." Plaintiff's Exhibit 4, September 22, 1980 Report of ACI Classification Board, p. 3. The Board has subsequently convened to reconsider Carillo's classification, but has again refused to release him from solitary.

The plaintiff testified at the September 1981 trial as to the conditions of his confinement since the original trial. He stated that since April 1981 he has been in a punitive segregated status. As a result, he is not permitted to see visitors, even on a non-contact basis. (Tr. at 71). His purchases from store orders are strictly limited. (Tr. at 73). He is not permitted to engage in communal religious services, (Tr. at 75), or go to the library, and is restricted to one book a week, even though this is inadequate reading material for him. (Tr. at 78–79).

1. In light of the favorable ruling of this Court on the plaintiff's eighth amendment claim, I need not reach his motion to adjudge the defendants in contempt.

2. The so-called Morris Rules are a detailed set of procedures for the discipline and classification of prisoners at the ACI which were adopted by a consent judgment of this Court. For a brief discussion of the history of the Morris Rules, see *Morris v. Travisono,* 499 F.Supp. 149, 152–53 (D.R.I.1980). A copy of the Morris Rules, as currently in effect, can also be found in that opinion. *Id.* at 161–74.

Finally, he is not permitted to go outdoors to exercise, but is restricted during his one hour exercise period to a small area outside his cell. (Tr. at 76).

The defendants claim that it is necessary to house the plaintiff in segregated confinement to protect the lives and well being of the staff and inmates of the ACI as well as the plaintiff himself. To support this conclusion, they point to Carillo's "disciplinary and criminal record, particularly his murder conviction as it relates to the threat the plaintiff poses to the security of the institution as well as his present ability to adjust to the general population." Defendants' Memorandum of Law, at 14. Additionally, defendants claim that the plaintiff's consistent refusal to stand for the count and sleep at the required end of the bed reflects "a deliberate and persistent pattern of unwillingness on [his] part to observe the basic rules that apply to him and others in that category in the High Security Center." Deposition of John Moran, p. 6. Finally, the defendants contend that Carillo is not psychologically fit to be released to the general population. In support of this contention they offer the psychiatric report of Dr. Bernard Duval, the prison psychiatrist, who concluded:

> In my judgment, Mr. Carillo is not psychiatrically treatable, nor is he rehabilitable in any dynamic sense of that word. All that can be done, as I see things now, is to offer him whatever self-betterment programs that may be available contingent on the circumstances of his incarceration, taking it step by step.

Plaintiff's Exhibit A, Department of Corrections Report to Chief Judge Pettine, Appendix A. Psychiatric Report of Bernard Duval, M.D. at 2.

The plaintiff, for his part, seeks to establish that there is no legitimate penological basis for his continued segregated confinement, and that eight-and-a-half years of isolation has had damaging psychological effects on him. At the original trial, he introduced the testimony of Dr. Augustus Kinzel to establish the adverse effects of his prolonged isolation. Dr. Kinzel testified that Carillo's segregated confinement has resulted in traumatic neurosis with acute depression manifested by periods of intense irritability, withdrawal, inability to concentrate, a preoccupation with his body, insomnia, and a development of physical symptoms with little or no physical basis. *Morris v. Travisono,* 499 F.Supp. at 151.

The plaintiff introduced further expert testimony at the September, 1981 hearing. Dr. Wesley Profit, director of prison mental health services for the State of Massachusetts, testified that Carillo has an anti-social and sociopathic personality by history. (Tr. at 129). He based this conclusion on Carillo's frequent disregard for the norms and laws of society. Despite this diagnosis, Dr. Profit concluded that Carillo presently had control over his anger, (Tr. at 111, 132), and that his recent disciplinary infractions, refusing to stand for the count and sleeping at the wrong end of the bed, were merely a passive form of protest. (Tr. at 132).

Dr. Profit also testified that the treatment and rehabilitation plan devised for Carillo by the Department of Corrections in response to this Court's prior decision is inadequate. He criticized the plan for not containing goals, a manner for achieving those goals or a time frame within which they could be attained. (Tr. at 135-36). Dr. Profit stated that he believed an appropriate treatment plan could be devised for Carillo and that he could be returned to general population with a sufficient monitoring plan. (Tr. at 116).

Finally, Dr. Profit testified that the conditions of Carillo's confinement constitute cruel and unusual punishment. He based this conclusion on the length of Carillo's isolation and the absence of any means for him to secure release from his present situation. (Tr. at 147). He also concluded that there is no legitimate penological justification for continuing Carillo's solitary confinement. (Tr. at 152).

Joseph Cannon also testified as an expert witness on behalf of the plaintiff. Professor Cannon has been employed in the corrections field for over twenty years. He is currently a professor at the University of

Missouri at St. Louis in the Administration of Justice Department. Professor Cannon testified that he was familiar with Carillo's prior convictions for crimes of violence against corrections officers, his recent disciplinary record, as well as the current circumstances of his confinement. (Tr. at 14–22).

Professor Cannon agreed with Dr. Profit that Carillo should be reintegrated into the general population of the high security facility. (Tr. at 28). He felt that his recent disciplinary infractions were merely a passive form of resistance, (Tr. at 15), and that moving Carillo back into general population would not pose an undue security risk for the institution since it is a high security facility in which inmates are under very close observation. (Tr. at 50). Professor Cannon concluded that the conditions of Carillo's confinement constitute cruel and unusual punishment. (Tr. at 32–33). He testified that Carillo's extended confinement in solitary has had an adverse effect on him, (Tr. at 46), and that there is no longer a legitimate basis for housing him in solitary confinement. (Tr. at 47). According to Professor Cannon, "because of what this man did in 1973, there is a plan to keep him in this kind of subhuman state which borders on daily torture of a human being." (Tr. at 33).

## II. DISCUSSION

The eighth amendment prohibits the infliction of cruel and unusual punishment. There is no static test for determining whether the conditions of an inmate's confinement are "cruel and unusual"; rather, the eighth amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1957)). In applying contemporary standards of decency to challenged prison conditions, the Supreme Court has held that the eighth amendment prohibits not only physically barbarous punishments but also "unneces-

sary and wanton" inflictions of pain that are "totally without penological justification." *Gregg v. Georgia,* 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929, 49 L.Ed.2d 859 (1976); *See also Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

The narrow issue posed by the present case is whether the segregated confinement of the plaintiff for the past eight-and-a-half years is without sufficient penological justification and therefore violates the eighth amendment. Solitary confinement is not *per se* unconstitutional. *Hutto v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978); *Sostre v. McGinnis,* 442 F.2d 178, 192 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). Under certain circumstances, however, solitary confinement may be so onerous that it constitutes cruel and unusual punishment. *See, e.g., Hutto v. Finney,* 437 U.S. at 686, 98 S.Ct. at 2571; *Bono v. Saxbe,* 620 F.2d 609, 613–14 (7th Cir. 1980); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972), cert. denied, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1973). As the First Circuit has observed, where solitary confinement is "[i]mposed inappropriately *or for too long a period,* even the permissible forms of solitary confinement might violate the Eighth Amendment." *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir. 1974) (emphasis added).

Where prisoners have been confined in isolation for long periods of time, courts have carefully scrutinized the reasons for this extended confinement. *Kelly v. Brewer,* 525 F.2d 394, 399–400 (8th Cir. 1975); *Jackson v. Amaral,* No. 80–219–Z, slip op. at 9–10 (D.Mass. May 24, 1982) order stayed *Jackson v. Meachum,* No. 82–1455, mem. order (1st Cir. June 9, 1982); *United States ex rel. Bennett v. Prasse,* 408 F.Supp. 988, 999 (E.D.Pa.1976). As the Eighth Circuit declared in *Kelly v. Brewer:*

> While, as stated, administrative segregation is not inherently unconstitutional, its validity depends upon the relative humaneness of the conditions of the segregated confinement and in individual cases

upon the existence of a valid and subsisting reason or reasons for the segregation. ... It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for past misconduct. Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future. 525 F.2d at 400. Judicial review of prison officials' justification for holding a prisoner in solitary confinement for an extended period of time is necessitated by the debilitating effect such confinement can have on a prisoner. As this Court observed in *Morris v. Travisono,* "[e]ven if a person is confined to an air-conditioned suite at the Waldorf Astoria, denial of meaningful human contact for such an extended period may very well cause severe psychological injury." 499 F.Supp. at 160. *See also O'Brien v. Moriarty,* 489 F.2d at 944 ("[f]or a person to be cut off markedly from all others is a privation not to be underestimated.")

In reviewing the defendant corrections officers' justification for keeping Carillo in solitary confinement for the past eight-and-a-half years, this Court must be especially deferential to the prison authorities' adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). *See Rhodes v. Chapman,* 101 S.Ct. at 2400 n. 14. Considerations of internal security are peculiarly within the province of corrections officials, and courts should ordinarily defer to their judgments. Nevertheless, courts have a responsibility to ensure that the conditions of a prisoner's confinement are not cruel and unusual punishment in violation of the eighth amendment, *Rhodes v. Chapman,* 101 S.Ct. at 2401, and this determination necessarily involves a review of corrections officials' decisions—even if they pertain to prison security and discipline. It cannot be seriously contended that prison administrators can wholly evade judicial review by merely raising institutional security concerns. *See Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974); *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969).

After a thorough examination of the record in this case, I find that the defendants' decision to house Carillo in solitary confinement for the past eight-and-a-half years is without sufficient penological justification, and as a consequence has resulted in the "unnecessary and wanton infliction of pain" in violation of the eighth amendment. *Cf. Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290 (failure to provide adequate medical care violates eighth amendment since it serves no valid penological purpose). Cutting an individual off from all meaningful human contact after the reasons for such segregation no longer exist offends in a fundamental way contemporary standards of decency.

The defendants contend that Carillo cannot be safely returned to the general population of the high security facility of that institution. They base this contention on two grounds. First, they claim that Carillo's disciplinary and criminal record clearly establish that he is still dangerous. Second, they argue that Carillo is not psychologically fit to be returned to general population.

With respect to the first claim, I find it is not persuasive in its premise of Carillo's criminal record. It needs no profound deduction to conclude that his record is no worse than many others in maximum security; and as to his disciplinary record during the eight year period since that conviction, it is not a sufficient basis for his continued isolation. Although his record is not exemplary, he has not been found guilty of any disciplinary violations of a violent nature in

the past three years. Certainly refusing to stand for the count and sleeping at the wrong end of the bed are not serious enough infractions to justify continued solitary confinement. Indeed, defendant Moran acknowledged at the original trial that Carillo's recent behavior would merit release to the general population. *See Morris v. Travisono,* 499 F.Supp. at 152.

The defendants' claim that Carillo is not psychologically fit to be returned to the general population is also not supported by the record. Dr. Duval's testimony that Carillo is entirely beyond rehabilitation was contradicted by both of the plaintiff's experts. Moreover, even if Carillo is not psychiatrically treatable, this alone is not a sufficient basis for indefinitely holding him in solitary. Both of the plaintiff's experts testified that Carillo could be safely removed from solitary confinement, and the defendants failed to offer any specific evidence contradicting this conclusion.

The defendants' claim that Carillo is too dangerous to be returned to the general population appears to this Court to be a mere pretext for unduly punishing him for his 1973 murder conviction. In the eight years that have elapsed since that conviction, the defendants have not meaningfully reviewed Carillo's progress, nor have they attempted to evaluate whether he could adjust to the general population. Instead, they have advanced a series of unsatisfactory justifications for Carillo's continued solitary confinement. At the original trial, they maintained that Carillo must be kept in isolation to protect him from correctional officers at the ACI who might seek revenge for his 1973 murder of a prison guard. *See Morris v. Travisono,* 499 F.Supp. at 152. As a result of this Court's previous decision ordering the defendants to reconsider Carillo's status without considering the hostility of the prison guards toward him and without placing undue emphasis on his 1973 murder conviction, the defendants no longer purport to rely on these considerations. Now the defendants appear to be contending that the fact that Carillo was convicted of murdering a prison guard, coupled with Dr. Duval's conclusion that he is neither treatable nor rehabilitable, prove that Carillo is too dangerous to be released into general population. These generalizations conflict with the testimony of both plaintiff's preeminent experts and belie Moran's own assessment.

The defendants' refusal to even attempt to return Carillo to the prison's general population once in the past eight-and-a-half years strongly reinforces this Court's conclusion that Carillo has been kept in isolation not for his dangerous propensities, but because he was convicted of the murder of a prison guard. The fact is that Carillo seeks only to be returned to the general population of a *high security facility* where his activities can be closely supervised. There is simply no explanation why an inmate whose disciplinary record for the last several years reveals no violent behavior would be any more difficult to control than other inmates who are sufficiently "dangerous" that they must be housed in a high security facility.

Surely if Carillo was being confined in solitary due to the sincere belief of prison authorities that he could not safely exist in the general population, these authorities would have taken steps to ameliorate the debilitating effects of this isolation. Instead, the defendants have deliberately ignored Carillo's basic psychological and social needs and have thereby unnecessarily increased his suffering. Carillo has been denied a radio for most of the period of his solitary confinement. He has not been given adequate reading material, and has been denied the opportunity to participate in work and educational programs. His exercise has been limited to walking in the corridor outside his cell for one hour a day—hardly the recreational exercise that is so important to the maintenance of a sound mind and a healthy body. Such control over this inmate exacerbates the loneliness, isolation and feelings of inadequacy that are the inevitable result of eight-and-a-half years of solitary confinement. There can be no doubt in view of the testimony of the plaintiff's experts that this prolonged confinement has taken its toll on Carillo.

*See* (Tr. at 46, 144–45); *Morris v. Travisono,* 499 F.Supp. at 151.

No one can guarantee the future will not witness another dastardly and revolting crime; this is no less true of some of the other inmates. A mental aberration as to the mores of society is endemic to a prison population; stability of character and emotions is in most instances, alien to an inmate. The hell of prison life and the problems confronting guards is the inherent danger that can explode any incident into a major cause. But then, that is why the most dangerous men are confined in a maximum security setting where if properly supervised by competent personnel, they can be controlled.

In sum, this Court holds that the conditions of the plaintiff's confinement, when considered in light of the lack of a legitimate justification supporting it, are as barbarous as the filthy physical conditions that have been consistently condemned in other prison cases. *See, e.g., Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977); *Pugh v. Locke,* 406 F.Supp. 318 (N.D.Ala.1976). Accordingly, Carillo's treatment violates the eighth amendment. Confining a man to his cell for 23 hours a day and denying him all opportunities to express himself for eight-and-a-half years can have at least as devastating an effect on a prisoner as a complete lack of sanitation. Contemporary standards of decency forbid such treatment.

## III. RELIEF

This Court is well aware that reintegrating Carillo into the general population is not a simple matter. The murder of a prison guard evokes a tremendous amount of emotion on the part of the prison authorities and inmates, and it is apparent from the facts of this case that this emotion has not subsided in the eight years since Carillo's conviction. The prison authorities may have a difficult time adjusting to Carillo's presence in the general population after eight years in isolation. Moreover, Carillo himself may have a difficult time adjusting. Thus, I am reluctant to order the unconditional release of Carillo into the general population.

Nevertheless, Carillo's continued solitary confinement can no longer be countenanced. Both of the plaintiff's experts testified that Carillo should be gradually reintegrated into the general population, spending at first trial periods there, and gradually being moved there on a more permanent basis. (Tr. at 50, 140). Therefore, I order the defendants to develop a written plan under which Carillo will be gradually reintroduced into the general population of the high security facility of the ACI. This plan shall provide for the complete reintegration of Carillo into general population within three months. It shall also provide for consistent treatment for Carillo by a psychologist to assist him in making the transition, as well as a mechanism whereby both Carillo and the prison guards can voice their concerns over any problems which may arise during this transition period. In light of the complexity of the legal issues posed by this case, and the nature of the relief sought, I will stay implementation of this order pending appeal.