Lauriat, J.
The plaintiffs, inmates who were or are currently housed in the Department Disciplinary Unit (“DDU”) at the Massachusetts Correctional Institution at Cedar Junction (“Cedar Junction”), brought this class action in January 1994, on their own behalf and on behalf of all inmates who are or may in the future be confined in the DDU. The defendants are officials of the Department of Correction (“DOC”) and of the Department of Mental Health (“DMH”). The plaintiffs have challenged the allegedly “unlawful and inhumane conditions” of their confinement at the DDU, and have asserted that the defendants have violated plaintiffs’ constitutional and statutory rights.
The plaintiffs were sentenced to prison after being convicted of first degree murder, second degree murder, aggravated rape, and armed robbery. Each plaintiff was assigned to the DDU after being found guilty of committing a major disciplinary violation while incarcerated. These violations include: stabbing another inmate, kicking and headbutting a correction officer; destroying a cell and throwing coffee at a correction officer; punching an officer in the face; and fighting with an inmate and biting an officer who responded to the fight. Some of the plaintiffs were found guilty of committing major disciplinary violations while incarcerated in the DDU. One was found guilty of breaking out of an exercise yard and attempting to attack another inmate; another, of biting a correction officer and spitting at a doctor in the DDU; and still another, of throwing urine at a correction officer.
Plaintiffs challenge the alleged lack of due process in the disciplinary proceedings that led to their commitment to the DDU, and the policies, procedures, and confinement practices that result in allegedly unlawful and inhumane conditions of plaintiffs’ DDU confinement. (Amended Complaint, par. 1.) The plaintiffs’ action is a systemic challenge to the operation of the DDU rather than to requests for relief based on assertions of individual plaintiffs. The systemic nature of their challenge is evident from the Amended Complaint and the relief sought.
Plaintiffs contend that defendants inappropriately assert that evidence regarding individual prisoners’ experiences in the DDU is not relevant on the declaratory judgment counts and does not raise material issues of disputed facts. (Defendants’ Brief, 10.) Plaintiffs contend that individual prisoners’ experiences provide evidence of actual conditions in the DDU. Hence, they claim that information pertaining to the nature and effect of DDU confinement on individual inmates is relevant and presents issues of material fact which precludes summary judgment on their declaratory judgment claims.[2]
On July 1, 1994, the Superior Court (Flannery, J.) entered a Pre-Trial Case Management Order in this action which provided that it would not proceed as a class action,[3] that pursuant to Mass.R.Civ.P. 42(b), plaintiffs’ damage claims would be bifurcated from their declaratory judgment claims, and that this court would resolve plaintiffs’ declaratory judgment claims before considering their claims for damages.[4] The Case Management Order specified that after the declaratory judgment stage, “the Court will entertain motions for appropriate enforcement orders, including *388 injunctions, and will schedule a prompt trial on the damage claims.” (CMO, p.3.)
The plaintiffs have now moved for summary judgment on Count IV of their Amended Complaint against the Commissioner of the Department of Mental Health,[5] and the defendants have moved for summary judgment on all counts. On May 7, 1996, the court, accompanied by counsel for the parties, took an extensive view of the DDU. Thereafter, the parties presented oral arguments on their summary judgment motions.
PROCEDURAL POSTURE OF THIS CASE
In the intervening two and one-half years since the Case Management Order was issued, it appears that many of the named plaintiffs have been released from the DDU, thereby making their claims moot.[6] At the same time, the parties, through their attorneys, have spent substantial time, effort, investigation and research in preparing and presenting the issues in this case to the court. It would be unfair for this court to dismiss or ignore some or all of the claims and issues that have been raised simply because the named plaintiffs are no longer in the DDU.
Accordingly, with respect to any issue which remains open as a result of this decision, the court would urge the parties to stipulate to the facts regarding the allegations made by those inmates no longer in the DDU.[7] Alternatively, the parties could stipulate that those inmates no longer in the DDU would be permitted to present evidence at trial with respect to their claims, even though they were no longer parties to the action. If the parties are unable or unwilling to so stipulate and agree within ninety days from the date of this decision, the court would order reconsideration of the portion of the Case Management Order which denied class action status to the plaintiffs in this case.
BACKGROUND
Plaintiffs have made claims of unlawful confinement in isolation (Amended Complaint, pars. 32-47), inadequate psychiatric screening, monitoring and treatment (pars. 48-64), inadequate medical treatment (pars. 65-69), systematic use of gassings, beatings and restraints (pars. 70-78), inadequate food (pars. 79-82), denial of access to the courts (pars. 83-87), and unlawful DDU hearings (pars. 83-95.) The defendants have denied each and all of these claims.
The summary judgment record[8] presently before the court reveals the following material undisputed facts: Before the DDU opened, DOC inmates who committed major disciplinary violations while incarcerated were assigned to the Department Segregation Unit (“DSU”). DSU inmates were permitted to participate in prison rehabilitation and educational programs. They could also purchase items from the canteen, smoke cigarettes, have a television and radio in their cells, make up to three fifteen minute telephone calls per week, and have a maximum of three contact social visits per week. Nearly fifty percent (50%) of the inmates released from the DSU were returned to it.
Defendant Larry E. DuBois (“DuBois”) became Commissioner of the DOC in July, 1991. DuBois, along with defendant Michael Maloney (“Maloney”), Deputy Commissioner of the DOC, and defendant Ronald Duval (“Duval”), Superintendent of Cedar Junction, determined that a more restrictive disciplinary unit was needed to deter disciplinary violations more effectively. They decided to implement a unit akin to the federal “control unit” facility in Marion, Illinois where DuBois had previously worked and where the recidivism rate was quite low.
The DDU opened in April 1992, to house inmates who had been found guilty of committing major disciplinary violations and to provide a more restrictive environment than that of the DSU. According to the defendants, the DDU has successfully deterred disciplinary "violations and has had only an eight percent (8%) recidivism rate.[9]
In order for an inmate to be sent to the DDU, a DOC officer must fill out a disciplinary report alleging a violation. The disciplinary officer at the facility where the inmate is housed must then determine that the violation is “major” under 103 Code Mass. Regs. 430.09(4) and is sufficiently serious to refer the matter to a DDU Special Hearing Officer. In 1995, the disciplinary officer at Cedar Junction referred approximately three percent (3%) of the disciplinary violations to the DDU hearing officer. Approximately five percent (5%) of the disciplinary officer referrals were reversed by the Deputy Commissioner, who must agree with the referral before the matter is heard by the Special Hearing Officer.
After a hearing, if the Special Hearing Officer finds the inmate guilty of the major disciplinary violation alleged and concludes that the violation warrants a DDU sentence under 103 Code Mass. Regs. 430.09(4), he may sentence the inmate to a maximum of ten years in the DDU. The inmate may then appeal to the Commissioner or his designee. In approximately ten percent (10%) of the inmate appeals, Deputy Commissioner Maloney, who has served as the Commissioner’s designee, has either reversed the decision of the Special Hearing Officer or shortened the DDU sentence. If Maloney denies the appeal, the inmate may seek redress through an action in the Superior Court in the nature of certiorari pursuant to G.L.c. 249, §4.
The DDU is a modern secure facility with a capacity to house 124 male inmates in individual cells. It has three wings; each wing has four tiers; and each tier has eleven or twelve cells and one shower.
Each cell is approximately seven feet by twelve feet. Each has a toilet, a sink, a bed, a desk with an attached seat, and a five and one half inch by fifty-seven and one half inch window at the rear of the cell. *389 Each cell is illuminated by two forty-watt four-foot long fluorescent lights. Each cell also has a thirteen-watt nightlight.
The walls of each cell are concrete. There is a small gap between the floor and the base of the cell door. Each cell door is solid steel with a four inch by twenty-six inch window. Each door also has approximately twenty-three one-eighth inch holes located four and a half feet above the floor.[10] Each door also has two slots. The upper slot is used to serve food to and handcuff the inmate. The lower slot provides access to the inmate’s ankles so that they may be shackled. Inmates are shackled and handcuffed any time they leave their cells. Because no two cells face each other, inmates in their cells in the DDU cannot see one another.
There are three exercise pens attached to the DDU, each of which contains seven separately fenced exercise areas. Each area is approximately seven feet wide by thirty-five feet long by ten feet high, and is covered with a chain-link fence on the top and on all sides. Recreational equipment is not allowed. According to the defendants, DDU inmates may exercise one hour each day for five days each week. Defendants admit, however, that prior to the Fall of 1995, DDU inmates were deprived of exercise as a form of punishment. The DOC no longer follows this practice, but DDU inmates may be denied exercise for safety or security reasons, including prison lock-downs. There is also evidence that, because there is no area for indoor exercise, DDU inmates do not exercise during inclement weather. Further, the plaintiffs claim that often they are forced to choose between a counseling session and exercise because DDU authorities schedule counseling to conflict with the exercise hour.
The DDU has approximately thirteen multi-purpose rooms, some of which are used for mental health counseling. It also has a health services unit. There are four observation cells which have glass front walls and beds with modifications to allow the inmates to be placed in four-point restraints.
Correction officers make rounds on the tiers once every hour. The Director of the DDU, defendant Phillip L. Harrington (“Harrington”), and the Captain of the DDU[11] who is second-in-command, make rounds once each business day. The correctional program officer makes rounds two or three times per week. Nurses or medical assistants generally make rounds four times each day. Mental health and religious staff make rounds once each week. During these rounds, inmates may speak with the officers, medical personnel, or religious staff through their cell doors or by passing a note. Inmates may speak with one another while in the exercise yard. It is possible for the inmates to speak to each other while in their cells, although there is some evidence that communicating in this fashion is quite difficult.
A DDU inmate may not participate in any prison programs or correspondence courses, and he may not have educational materials in his cell. During the first thirty days of a DDU sentence, an inmate may not have a radio or television. He may not make telephone calls or have any visits except with clergy or with his attorney upon the attorney’s request. He may keep up to twelve photographs in his cell and have paper and a pen with which to write letters. He may shower and shave three times a week and receive materials to clean his cell once a week. He may borrow books from a general book cart and may keep up to four books plus a religious book in his cell at any one time.
He may also use a legal book cart which contains approximately thirty-five legal books. There is one such cart for each wing of the DDU. If an inmate would like a photocopy of a case, he may submit a request for the main prison law library to copy it for him. He may also request to use materials from the main prison law library by completing and submitting a request form.
According to the plaintiffs, however, the book cart materials are inadequate and there are lengthy delays in receiving photocopies of cases and requested materials from the main prison law library. Plaintiff Charles Chase claims that he could not pursue an action against the DOC relating to a claim of inadequate health care. According to plaintiff Keith Parkinson, he was unable to pursue challenges to his federal bank robbery conviction because of the lack of federal case-law and materials. Plaintiff Adrian Almeida asserts that he could not file a complaint arising from an isolation sanction. Plaintiff Mark MacDougall maintains that because of the inadequacies of the book cart, he was unable to file a responsive pleading in his appeal from an adverse ruling in a civil rights action against DOC. Consequently, his appeal was dismissed.
An inmate in the DDU may receive a DOC-owned radio after thirty days without a disciplinary violation. During the next thirty days, he will be allowed to make one thirty-minute telephone call and have one non-contact visit which generally lasts about one hour. If the DDU inmate has sixty consecutive days without a disciplinary violation, he will be issued a DOC-owned television, be allowed to make two phone calls, and have two visits. After ninety days without a violation, he may make three telephone calls and have three visits. After one hundred and twenty days without a violation, he may make four calls and have four visits. If a DDU inmate is found guilty of a major disciplinary violation, he loses all privileges and returns to new-man status.
DDU inmates eat alone in their cells and they may not purchase items from the canteen. According to Joanne Gunnard (“Gunnard”), registered dietician and Food Services Director at Cedar Junction since January, 1995, DOC’s Director of Food Services, Peter *390 Szafir, sends Gunnard a five-week menu from which she prepares food for inmates and correctional officers at Cedar Junction. Inmates in the DDU receive three meals daily and the same quantity and quality of food as inmates in general population at Cedar Junction. Inmates on “alternate feeding,” who are not allowed to have utensils, receive food that can be eaten without utensils.
Food is served in two “temp-tech” trays, one for cold food and the other for hot food. The hot trays are placed on carts which have electrical warming units to maintain the temperature of the food at a minimum of 160 degrees Fahrenheit. The carts are unplugged when the delivery truck is ready to go to the DDU. The carts may be plugged in to an electrical outlet prior to serving the food. At least five times per week, a staff member checks the temperature of the food before it is served. If the temperature is below 145 degrees, the food is sent back to the kitchen to be reheated or replaced.
Mary Joan McLarney (“McLarney"), a registered dietician employed by Canteen Corporation to review institutional menus for various clients including the DOC, analyzed the DOC’s fall-winter cycle menu in November, 1995. Based on the Nutritionist IV Diet Analysis and Evaluation Module, the menu, according to McLarney, meets or exceeds the nutrient requirements specified by the Recommended Daily Allowances. The menu affords inmates on average approximately 2900 calories daily which reflects the mean population requirement for males age twenty-five to fifty.
Plaintiff Adrian Almeida went from 220 pounds to 180 pounds during a five-month DDU confinement and was denied double portions which his doctor had ordered due to Almeida’s HIV positive condition. Since leaving the DDU, Almeida has regained the weight that he had lost. Plaintiff Keith Parkinson asserts that he has been deprived food on three or four occasions as a result of his comments about the quality or quantity of the food. According to plaintiff William Robinson, he lost thirty pounds while in the DDU, was placed on alternate feeding twice when he received a sandwich and juice instead of a regular meal, and he received smaller portions than those he received in general population. Plaintiff Basil Williams claims he went from 215 pounds to 160 pounds while in the DDU, the portions were too small, the meat was undercooked to the point of being inedible, and, despite a doctor’s orders to serve him double portions, defendants refused, contending that the food was adequate.
From Januaiy 1, 1992, through June 30, 1994, the DOC contracted with Emergency Medical Services Associates, Inc. (“EMSA”) to deliver medical and mental health services to inmates. Since July 1, 1994, the DOC has contracted with Correctional Medical Services, Inc. (“CMS”) to provide these services. Nurses staff the DDU approximately sixteen hours per day. Physicians periodically examine inmates and see inmates referred by nurses in the health services unit.
Since February 1994, Cedar Junction has been accredited by the National Commission on Correctional Health Care (“NCCHC"), a national association which oversees and accredits correctional health care systems. The contract between CMS and the DOC requires that the DOC institutions continue to be accredited by NCCHC.
Pursuant to G.L.c. 127, §39, the DOC is to provide periodic examinations of inmates in segregated emits under the supervision of the DMH. In 1991, the DMH agent who had been in charge of such supervision expired and DMH’s supervision of inmate health care apparently expired with him. Six inmates’ counsel brought G.L.c. 127, §39 to the attention of Dr. M. Annette H. Hanson (“Hanson”), Deputy Commissioner for Clinical and Professional Services for DMH.[12]
In August 1994, the DMH hired Neurological Associates of Natick, P.C. (“NAN”) to review the health care at the segregated units of Cedar Junction, including the DDU. Dr. Benjamin Matzilevich (“Matzilevich”) of NAN reviewed the protocols and standards of CMS. Matzilevich also interviewed staff, reviewed randomly selected medical records and interviewed a random selection of inmates. In September, 1994, Matzilevich completed a ten page report which summarized his findings and concluded that quality health care was being provided to the inmates in the segregated units of Cedar Junction. Matzilevich reported, however, that all of the men interviewed complained that mental health services were inadequate and lacked privacy. Further, “[ijssues related to privacy and confidentiality continually need to be examined and improved. Mental health services provide effective interventions to meet the needs of men who are in acute crisis. However, proactive services offered through mental health clinicians are limited.”
In February or March 1995, Hanson conducted a one-day inspection of the segregated units of Cedar Junction which included the East Wing Segregation Unit, the West Wing Segregation Unit, the Health Services Unit, and the DDU. Hanson did not review any medical files or interview any DDU inmates. However, she reviewed CMS’s policies and procedures and discussed DMH’s role pursuant to G.L.c. 127, §39 with Kathleen Dennehy, DOC’s Deputy Commissioner for Health Services.
According to Hanson, in the future, DMH will visit DDU no more than annually for a one-day inspection during which it will review a random selection of inmate files and meet with inmates and staff. DMH will also follow up with DOC officials at the conclusion of the annual reviews. Hanson has stated, however, that DMH has no understanding of whether it has the authority to direct DOC to correct problems with inmate health care.
*391 DISCUSSION
Summary judgment must be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). With respect to any claim on which the party moving for summary judgment does not have the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving parly establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson, 404 Mass. at 17. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
In ruling on a motion for summary judgment, the court must not consider the “credibility of the witnesses or the weight of the evidence, nor should the [court] make findings of fact." Riley v. Presnell, 409 Mass. 239, 244 (1991), citing Attorney General v. Bailey, 386 Mass. 367, 370 (1982). However, “the movant is held to a stringent standard ... [A]ny doubt as to the existence of a genuine issue of material fact will be resolved against the movant." 10A C. Wright, A.R. Miller & M. Kane, Federal Practice and Procedure, §2727, at 125-25 (1983) (construing Fed.R.Civ.P. 56).
I. MOOTNESS
The defendants assert that the equitable claims of plaintiffs Adrian Almeida, Basil Williams, Michael Leoney, Corey Glover, Victor Torres, William Robinson, Mark MacDougall, and Jerell Bunce should be dismissed as moot because these plaintiffs have been released from the DDU. There is substantial authority holding that a prisoner’s claims for declaratory and injunctive relief regarding his conditions of confinement become moot when those conditions change due to a transfer. See e.g. Pidge v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 32 Mass.App.Ct. 14, 19 (1992). However, given the procedural posture of the case in light of the Case Management Order, as noted infra, the defendants’ argument is premature if not inappropriate. At a minimum, the denial of the plaintiffs’ initial request to treat this case as a class-action will be reconsidered by the court if the parties are unable to stipulate to the facts or the evidence that would be offered at the trial of this case.[13]
II. PLAINTIFFS’ SUMMARY JUDGMENT MOTION
Count IV: DMH violation of G.L.c. 127, §39
General Laws c. 127, §39 provides that “[u]nder the supervision of the department of mental health, all inmates confined to a segregated emit shall be given periodic medical and psychiatric examinations, and shall receive such medical and psychiatric treatment as may be indicated.” The plaintiffs assert that they are entitled to summary judgment against the Commissioner of DMH because DMH has failed to supervise the periodic medical and psychiatric examinations and treatment of inmates in segregated units as required by G.L.c. 127, §39. The plaintiffs argue that DMH’s recent supervision of inmate health care and the role which DMH plans for the future is inadequate as a matter of law to fulfill its duty under G.L.c. 127, §39. Plaintiffs further maintain that DMH’s historic neglect of its supervisory role makes injunctive relief appropriate.
There is no dispute that the DDU is a segregated unit to which G.L.c. 127, §39 applies, and that the DMH failed to provide the mandated supervision from 1991 until several months after this suit had been filed. Thus, for the first two years of the DDU’s operation, the DMH provided no supervision of inmate health care. In Layne v. Superintendent, MCI Cedar Junction, 406 Mass. 156 (1989), the Supreme Judicial Court held that where the defendants had cured a constitutional deprivation while the suit was pending, declaratory and injunctive relief was not appropriate. Id. at 160. The issue, then, is whether the DMH has cured its previous failure to comply with G.L.c. 127, §39. In other words, is the DMH’s contemplated review of inmate health care adequate and is the DMH currently providing the mandated “supervision”?
“ ‘Supervision’ is the act of one who supervises and to supervise is to oversee, to have oversight of, to superintend the execution of or performance of (a thing), or the movements or work of (a person); to inspect with authority; to inspect and direct the work of others.” Fluet v. McCabe, 299 Mass. 173, 179 (1938). As DMH has aptly argued, supervision does not require micro-management. Nor will it prevent or avoid all problems in the delivery of health care services. However, it does require sufficient attention to identify problems and it necessarily confers the authority to address and correct such problems.
Plaintiffs rebut defendants’ argument that because G.L.c. 127, §39 does not define the word “supervise” that the Court must defer to DMH’s interpretation. Plaintiffs contend that unless DMH’s interpretation of “supervision” rises to the level of the Supreme Judicial Court’s determination of the definition as meaning to *392 “oversee, and direct” then DMH’s interpretation fails. See Fluet v. McCabe, 299 Mass. 173, 179 (1938).
Plaintiffs argue that DMH cannot determine whether DDU inmates are receiving the necessary psychiatric treatment that may be indicated unless DMH learned the status of inmates’ health. DMH conducted a one day inspection of the DDU and did not speak with a single inmate or review any inmate’s mental health file. (Hanson, TR1:90, 99-100.) Plaintiffs contend that this did not allow DMH to ascertain the mental health status of DDU inmates.
Plaintiffs assert that §39 was enacted to provide an additional safeguard for segregated inmates’ mental health. Since DMH’s appraisal of inmates’ mental health status is superficial, DMH’s conduct fails to satisfy the statute, according to plaintiffs.
The person in charge of DMH’s compliance with G.L. 127, §39, M. Annette Hanson, M.D., construed the statute to mean, the kind of overview done by accrediting and licensing agencies in the health care field to determine whether services were being delivered. (Hanson Aff. par. 8 at 4.) Hanson did not construe the statute to require DMH to review the medical records of each inmate or to review the clinical decisions made in treating those inmates. (Hanson Aff. par. 8 at 4.)
According to Hanson’s deposition testimony, she was not aware of whether any changes had been made as a result of Matzilevich’s report. Despite Matzilevich’s reported problems with mental health care, Hanson did not direct changes in the delivery of such services and did not ensure that such changes were properly implemented.[14] Clearly, supervision requires more than just evaluation. Unless the DMH exercises its authority to direct changes in health care services when evaluation of those services reveals inadequacies, then the DMH fails to provide the mandated supervision. It is particularly troubling that the reported inadequacy was in the delivery of mental health care, an area which the DMH should be prepared to address, yet, no steps were taken to ensure that changes would be implemented.[15]
On September 12, 1986, DMH entered into a stipulation of dismissal in Alston v. Fair, D. Mass., Civil No. 77-3519-G. The stipulation provided that “DMH [would] comply with the provisions of G.L.c. 127, §39 that require DMH to supervise the provision of periodic medical and psychiatric examinations and treatment given to inmates of segregated units, as that term ha[d] earlier been defined by the court.” Previously, an Order Concerning the DMH’s Supervision of Medical and Psychiatric Care for Inmates in Segregated Units at MCI Walpole had entered which detailed what that supervision would entail. See Appendix A. Among other things, the provisions included a requirement that “[a]t least twice each year the DMH shall inspect MCI Walpole, including records of confinement of inmates in segregated emits and records of the provision of medical and psychiatric examinations and treatments given to inmates ...”
It is clear that even the future plan of the DMH to inspect the DDU annually does not meet the standard of supervision established by Alston. According to Hanson’s affidavit, although she was aware that the DMH had developed protocols in response to Alston, she has not seen them and would not follow them because of the significant changes in health care services since the early 1980’s, including the retention of CMS, a well-respected provider, the accreditation of Cedar Junction by NCCHC, and the reports of NAN. While these changes may affect the degree of supervision required, they do not relieve DMH of its duty to supervise. Clearly, this duty has previously been ignored or forgotten and even now seems to be a point of confusion as the DMH continues to be uncertain about its authority to effectuate changes in health care services.
Plaintiffs are entitled to summary judgment on Count IV of their Amended Complaint. By failing to provide supervision after NAN’s report, DMH has violated its statutory obligation pursuant to c. 127, §39 and, further, has ignored the Alston protocols. It is not the position of this Court that it should micro-manage the system at DMH. The parties should propose a remedy in keeping with the intent of the Legislature pursuant to G.L.c. 127, §39. The DMH shall supervise the provision of periodic medical and psychiatric examinations and treatments to DDU inmates pursuant to the protocols of Alston v. Fair, D. Mass. C.A. No. 77-3519-G. See Appendix A.
Further, the DMH should be notified about transfers of inmates to and from Bridgewater and the DDU. Section 39 requires that, “all inmates confined to a segregated unit shall . . . receive such medical and psychiatric treatment as may be indicated.” DMH cannot be fully aware of the medical and psychiatric treatment that an inmate may require if it is not notified of the need for an inmate to be treated at Bridgewater.
III. DEFENDANTS’ SUMMARY JUDGMENT MOTION
Counts I and II: Cruel and Unusual Punishment
The plaintiffs contend that their confinement to and treatment in the DDU constitutes cruel and unusual punishment in violation of the federal and state constitutions and 42 U.S.C. §1983.[16]
Incarceration constitutes cruel and unusual punishment in violation of the Eighth Amendment and Article 26 of the Massachusetts Declaration of Rights when conditions of confinement pose a substantial risk to inmates, and prison authorities are deliberately indifferent to that risk. Dee Farmer v. Edward Brennan,[17] 114 S.Ct. 1970, 1977 (1994); Good v. Commissioner of Correction, 417 Mass. 329, 335-37 (1994).
*393 “The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, (citation omitted), prohibits the infliction of‘cruel and unusual punishments’ on those convicted of crimes.” Wilson v. Setter, 111 S.Ct. 2321 (1991). “Only the ‘unnecessary and wanton infliction of pain’ implicates the Eighth Amendment. . .” Id. at 2323, quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976).
“Article 26 of the [Massachusetts] Declaration of Rights prohibits the infliction of cruel or unusual punishments. [The Supreme Judicial Court] has read art. 26 to be at least as broad as the Eighth Amendment to the Federal Constitution. (Citation omitted.) Article 26 bars punishments which are found to be cruel or unusual in light of contemporary standards of decency which mark the progress of society, (citation omitted.) In divining contemporary standards of decency, we may look to State statutes and regulations, which reflect the public attitude as to what those standards are. (citation omitted.)” Good v. Commissioner of Correction, 417 Mass. 329, 335 (1994).
“An inmate need not wait until he suffers actual harm before he can assert a cause of action under art. 26 . . . Rather, a claim is made out if there is a substantial risk that the inmate will suffer serious harm as a result of the conditions of his confinement.” Good, 417 Mass. at 336.
“Eighth Amendment claims based on official conduct that does not purport to be the penalty formally imposed for a crime require inquiry into state of mind ...” The Court determined that it remains for the Court to consider what state of mind applies in cases challenging prison conditions. Wilson, 111 S.Ct. at 2326. The offending conduct must be “wanton.” Where prison officials are acting in response to a prison disturbance, then wantonness consists of acting “maliciously and sadistically for the very purpose of causing harm.” Wilson, 111 S.Ct. at 2326. “[A]ssuming the conduct is harmful enough to satisfy the objective component of an Eighth Amendment claim, . . . (citation omitted) whether it can be characterized as ‘wanton’ depends upon the constraints facing the official” Wilson, 111 S.Ct. at 2326. In Counts II and V of their Amended Complaint plaintiffs claim violations of Article 26 of the Massachusetts Declaration of Rights and of G.L.c. 127, §§32 and 39, grounded in the alleged lack of medical care and adequate food in the DDU.
A. Medical Treatment
“[T]he medical care a prisoner receives is just as much a ‘condition’ of his confinement as the food he is fed, the clothes he is issued, . . . and the protection he is afforded against other inmates. There is no indication that. . . the actions of prison officials with respect to these non-medical conditions are taken under materially different constraints than their actions with respect to medical conditions ...” Wilson, 111 S.Ct. at 2326, 2327. “[I]t is appropriate to apply the ‘deliberate indifference’ standard articulated in Estelle.’ ” Wilson, 111 S.Ct. at 2326, 2327. “ ‘Itis only such indifference’ that can violate the Eighth Amendment, (citation omitted) (emphasis added); allegations of ‘inadvertent failure to provide adequate medical care,’... simply fail to establish the requisite culpable state of mind.” Wilson, 111 S.Ct. at 2323. “[T]he State’s responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities.” Wilson, 111 S.Ct. at 2326, quoting Whitley v. Albers, 475 U.S. 312, 320 (1986).
“An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976). “[D]eliberate indifference to serious medical needs of prisoners constitutes the ‘unnecessary and wanton infliction of pain,’ (citation omitted) . . . proscribed by the Eighth Amendment in their response to the prisoner’s needs or by prison guards ... intentionally interfering with the treatment once prescribed.” Estelle, 429 U.S. at 104, 105. “In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend ‘evolving standards of decency’ in violation of the Eighth Amendment.” Estelle, 429 U.S. at 106.
DDU Director Phillip Harrington has received few complaints from inmates alleging that they are not receiving adequate medical treatment. When an inmate has complained, Harrington has advised Correctional Medical Services of the inmate’s complaint. Harrington believes that inmates are receiving adequate medical treatment. (Harrington Aff. pars. 25, 27, 28 March 1996).
In March 1996, plaintiff Keith Parkinson (“Parkinson") began experiencing extreme discomfort in one of his eyes as if something was stuck in the eye. He made numerous requests to corrections officers to be seen by a member of the medical staff, including verbal requests and letters to Director Harrington, Superintendent Duval, the DDU doctor and Health Services Unit Administrator Sandy Diskin. About a week after he had reported the problem, Parkinson was told by a C.O. that if he continued to complain about the lack of medical treatment he was receiving for the problem that he would be given a disciplinary report. Parkinson continued to ask to be seen by a doctor, since the eye condition was painful. He received a disciplinary report which alleged that he had verbally abused a nurse, which was not true. (Parkinson Aff. par. 4 at 2.)
William Dinkins broke his hand in January 1995. Prison officials did not provide treatment, medication or other medical attention form more than three hours *394 after he broke his hand. (William Dinkins’ Answers to Defendants’ First Set of Interrogatories, Response to Interrogatory No. 4.)
Plaintiff Almeida states that in 1993 he complained about extreme stomach pain for approximately eight days. He told the DDU nurse and a number of the night nurses about his stomach discomfort. Every time Almeida asked to see the doctor, he was told that there was a two to three week waiting list. When he finally saw a doctor he was sent the next day to the hospital where he remained for approximately seven days. (Almeida’s Answers to Defendants’ First Set of Interrogatories, General Objections at 20.)
Summary judgment must be allowed without prejudice to plaintiffs since the facts do not sustain a claim indicating that a systemic problem of inadequate medical treatment exists for inmates. This determination does not preclude plaintiffs asserting individual claims for injury suffered as a result of inadequate medical treatment.
B. Inadequate Food
“Because depriving a prisoner of adequate food is a form of corporal punishment, the eighth amendment imposes limits on prison officials’ power to so deprive a prisoner." Cooper v. Sheriff, Lubbock County, Tex., 929 F.2d 1078 (5th Cir. 1991). “[SJedentary men on the average need 2000 calories or more to maintain continued health.” Landman v. Royster, 333 F.Supp. 621, 647 (1971) (imposition of bread and water diet designed to break a man’s spirit to the end that his powers of resistance diminish, is inconsistent with current minimum standards of respect for human dignity, and is a violation of the Eight Amendment). “[PJrison authorities enjoy complete control over all sources of pleasure, comfort, and basic needs. Moreover, the pains of hunger constitute a dull, prolonged sort of corporal punishment. That marked physical effects ensue is evident from the numerous instances of substantial weight loss during solitary confinement.” Landman, 333 F.Supp. at 647.
The DOC defendants rely on the food services staff of the DOC to provide nutritionally and calorically adequate food to DDU inmates. The food services unit at Cedar Junction designs the menus and prepares the food for DDU inmates. The DOC determines that the meals meet recommended daily nutritional allowances prescribed by the federal government, and contain approximately 2900 calories, on the average.
In February 1996, there were seventy-eight inmates who had been housed in the DDU for more than six months. Of these, fifty-three files contained both the inmates’ weights upon arrival in the DDU and their weights on a later date. By comparison, forty of the fifty-three inmates weighed within 10% of their initial body weight; five had gained more than 10% of their initial weight; and eight had lost 10% or more of their body weight. Out of the eight who had lost more than 10%, two had lost more than 20% of their body weight upon arrival. The first of these two inmates was five feet, nine inches tall, and weighed 297 pounds upon entry into the DDU. The second inmate was five feet, eleven inches tall, and weighed 279 pounds upon entry. (McCrosson Affidavit, par. 8 at 4, 5 (March 18, 1996).
Plaintiff Keith Parkinson (“Parkinson”) contends that on approximately three or four occasions, he was deprived of food after expressing concern about the quality or quantity of the food. On those occasions, the food was being delivered by a corrections officer who refused to give the meal to Parkinson after Parkinson’s statements. (Parkinson Aff. par. 5 at 2, 3.)
PlaintiffWilliam Robinson (“Robinson") lost approximately thirty pounds while he was in the DDU. He alleges that the food portions were smaller than those he received when he was in with the general population. He asserts that he was put on “alternate feeding” twice for a week at a time and was given a sandwich and juice rather than a regular meal during those weeks. Robinson alleges he saw correctional officers spit on a food tray before they delivered it. (Robinson Affidavit, par. 13, at p. 3.)
Plaintiff Almeida contends in an affidavit that he lost forly pounds in approximately five months while confined to the DDU. This was cause for concern since Almeida is HIV positive and physicians have informed him that it is important for him to maintain his strength. (Almeida Affidavit, par. 3, at l.)[18] Further, Almeida was under doctor’s order to receive double portions of food when he entered the DDU in 1992. After an infraction in 1994, he obtained a temporary restraining order and was removed from the DDU. He was placed in a segregation unit at that time. When he returned to the DDU in September 1994, he was told by a nurse that he would no longer receive double-portions of food. When Almeida was seen by a physician several months later, the doctor confirmed the nurse’s assertion. The physician told Almeida he would not receive double-portions of food until his weight deteriorated. Almeida weighed 180 pounds when he left the DDU in January 1996. Since then Almeida has gained approximately 34 pounds and weighed 214 pounds as of April 29, 1996. (Almeida Affidavit, pars. 4, 5, 6 and 7 at 2.)
Plaintiff Basil Williams (“Williams”) complained of weight loss for lack of food because the portions were allegedly too small or the meat undercooked to the extent of being inedible. (Williams’Affidavit, pars. 2, 3 at p. 1.) A physician at the Shattuck Hospital instructed Williams to get double-portions of food because of a concern about Williams’ weight loss. Williams complained to Director Harrington, Commissioner DuBois, Superintendent Duval and Captain Doolin about the food in the DDU and defendants refused to allow plaintiff to receive double-portions of food. (Williams Affidavit, pars. 3, 5, 6 atp. 1, 2.)
*395 Summary judgment on the inadequate food claim must be denied, since there are genuine issues of material facts. Plaintiffs assert that most of the inmates have lost substantial weight during their stay in the DDU. Defendants dispute this allegation. A trial is necessary to determine whether defendants were deliberately indifferent to plaintiffs’ dietary needs, especially since physicians proscribed that adequate amounts of food be provided for plaintiffs Almeida and Williams for medical reasons.
C. Excessive Force
Although the plaintiffs have not asserted a specific legal claim in their Amended Complaint concerning the defendants’ alleged unlawful use of excessive force, they have raised factual allegations of the unconstitutional use of excessive force (Amended Complaint, pars. 70-78.)
“[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases . . . where the deliberate use of force is challenged as excessive and unjustified.” Whitley v. Albers 475 U.S. 312, 327 (1986). “ ‘Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.’ [Internal citation omitted.] That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict . . . courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard ... described, the case should not go to the juiy.” Whitley v. Albers 475 U.S. 312, 322 (1986).
“[OJfficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight of these competing concerns, corrections officials must make their decisions ‘in haste, under pressure, and frequently without the luxury of a second chance.’ ” [Internal citation omitted.) . . . (Application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance. Instead, the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on ‘whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.’ “ Hudson v. McMillian, 503 U.S. 1, 6 (1992). ”[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied ■in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7.
“[C]ourts considering a prisoner’s claim must ask both if‘the officials act[ed] with a sufficiently culpable state of mind’ and if the alleged wrongdoing was objectively ‘harmful enough’ to establish a constitutional violation.” Hudson, 503 U.S. at 8. Thus the subjective aspect of an Eighth Amendment claim can be distinguished from the objective facet of the same claim. Hudson, 503 U.S. at 8.
Under Whitley v. Albers, 475 U.S. 312 (1986), the extent of injury suffered by an inmate is one factor that may suggest whether the use of force was wanton and unnecessary. Hudson, 503 U.S. at 7. ‘The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it.” Hudson, 503 U.S. at 7. “When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. (Citation omitted.) This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9.
The scope of supervisory liability in the context of a constitutional claim of excessive use of force requires plaintiffs to demonstrate (a) a constitutional violation arising from a subordinate’s use of excessive force, (b) deliberate indifference by the supervisor, and (c) an affirmative connection between the supervisor’s conduct and the subordinate’s unlawful act. Maldonado-Denis v. Catillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994). To defeat summary judgment, plaintiffs must establish by means of “material of evidentiary quality,” the requisite affirmative link between a supervisor and the wrongful conduct of his subordinates. Maldonado-Denis, 23 F.3d at 581-85.
In the present case, Corey Glover (“Glover") received threats by a Corrections Officer that he would be physically harmed during unjustified cell extractions if Glover wrote letters to the courts complaining about such cell extractions. The C.O. stated “you can rat to the courts all you want, but I can gas you. Watch your back — you’ll get yours.” Glover has been subjected to cell extractions in which he was beaten and gassed as a consequence of making complaints. (Glover Aff. pars. 2, 3 at 1, 2.)
*396 Although plaintiff Michael Leoney does not recall the dates on which he witnessed the use of excessive force, he did observe Glover being gassed and beaten during a cell extraction. Additionally Leoney heard a C.O. throw a prisoner on the ground in one of the DDU yards and heard the prisoner being kicked and punched. (Leoney’s Answers to Defendants’ First Set of Interrogatories, Response to Interrogatory No. 6 at 8.)
Robinson was subjected to a forcible cell extraction for refusing to return a disposable styrofoam tray to the correctional staff. He claims that staff had left him unclothed in his cell and he refused to return his tray so that he could talk with the Captain. A “move team," consisting of five correction officers in riot gear, appeared at Robinson’s cell door. They opened the food slot and sprayed a chemical into Robinson’s cell. The team returned forty-five minutes later with a dog. The team allegedly ignored Robinson’s attempts to give up and allow himself to be cuffed. Robinson’s cell was sprayed with gas, which hit him in the face. The team attempted to enter the cell, which allegedly jammed. Once in the cell the team punched and kicked Robinson and the dog bit his foot. This continued after Robinson was handcuffed. Robinson was chained to a cement slab and left overnight in an observation cell that was freezing. He was given a blanket by the nurse at 4 a.m., that was taken away before the next shift. Robinson’s eye continued to bleed and the dog bite was left untreated.[19] Robinson stated in answer to interrogatories that Kenneth Ayala and Richard Holden were involved in the excessive use of force, along with other individuals that Robinson cannot identify. (Robinson’s Answers to Defendants’ First Set of Interrogatories, Response to Interrogatoiy No. 6 at 7.)
In response to interrogatories, plaintiff Basil Williams believes that excessive force was used during a cell extraction in April 1994 when inmate Mark Leonardi was gassed, beaten, forcibly removed from his cell, and placed in four point restraint for several days. This may have been as a result of Leonardi not returning his food tray when requested to do so because he was not served a full meal with the rest of his tier. (Williams Answers to Defendants’ First Set of Interrogatories, Response to Interrogatory No. 6 at 7.)
DOC Commissioner Larry DuBois contends that the DOC takes numerous steps to ensure that excessive force is not used against inmates at the DDU. He contends that Deputy Commissioner Maloney advised him that during the almost four years the DDU has been operating, only three inmates out of the more than four hundred who have been housed in the DDU have complained to the DOC alleging that they had been assaulted by staff. The complaints were investigated and were not found to have merit. (DuBois Aff. pars. 19, 20 at 7, 8 March 14, 1996). Nancy White, General Counsel for DOC, advised DuBois that six present or former DDU inmates have filed lawsuits alleging that correctional officials used excessive force against them while in the DDU. Only one officer in the DDU has been disciplined for using excessive force against an inmate. DuBois does not believe that excessive force is used against inmates housed in the DDU. (DuBois Aff. pars. 21, 22, 23 at 8, 9 March 14, 1996.)
In answers to interrogatories, four of the eleven plaintiffs did not identify excessive force having been used against them while in the DDU. (Bean Aff. Ex. 8, Leoney at 94-96, Dinkins at 107-09, Parkinson at 115-17, and Williams at 123-25.) However, three out of those four plaintiffs contend that they did witness excessive force being used against other inmates. (Bean Aff. Ex. 8, Leoney at 96, Dinkins at 108, 109, and Williams at 124.)
Summary judgment on the claim of excessive force is allowed, without prejudice. The facts do not indicate widespread use of excessive force rising to the level of violations on a systemic basis. However, this order does not preclude plaintiffs asserting individual claims against individual corrections officers for use of excessive force.
Count III: G.L.c. 127, §40
General Laws c. 127, §40 provides that “an inmate . . . may ... be confined, for a period not to exceed fifteen days for any one offense, to an isolation unit.” Plaintiffs maintain that DDU is an “isolation unit”[20] and, therefore, that any sentence to the DDU which exceeds fifteen days violates G.L.c. 127, §40. The question, then, is whether the DDU constitutes an “isolation unit.”
This issue has been addressed by several State and Federal courts, all of which have held that DDU is not an isolation unit. See e.g. McGuinness v. DuBois, 891 F.Supp. 25, 27-29 (D. Mass. 1995); Abrazinski v. DuBois, 876 F.Supp. 313, 319 (D. Mass. 1995), and cases cited; MacDougall v. DuBois, 2 Mass. L. Rptr. 294 (1994). Plaintiffs assert that DDU inmates have exhibited signs of mental harm as a result of their DDU confinement and, because the legislature sought to prevent such harm by enacting G.L.c. 127, §40, the statute should be construed to apply to the DDU.[21] Although well-reasoned, plaintiffs’ argument is unavailing.
General Laws c. 127, §40 “was rewritten in 1955 to substitute more humane treatment for the harsher conditions of solitary confinement previously imposed ...” Attorney General v. Sheriff of Worcester County, 382 Mass. 57, 60-61 (1980), citing St. 1955, c. 770, §31; Report and Recommendations of the Governor’s Committee to Study the Massachusetts Correctional System, 1955 Senate Doc. No. 750 at 43; McGrath, Criminal Law, Procedure, and Administration, 1955 Ann. Survey Mass. Law 119, 127-127. According to Fred Butterworth, who was employed by the DOC from 1950 until 1986, inmates serving isolation sanctions from 1956 until 1972 were housed in cells without *397 windows, were prohibited from communicating with each other, were generally confined to their cells twenty-four hours per day, were not offered exercise, and were provided with no reading material other than a religious book. Further, these inmates had no regularly scheduled medical visits, no social visits, showers, telephone calls, television, or radio. Thus, the isolation that followed the 1955 reform of the Massachusetts penal system was considerably more restrictive than the DDU. The conditions of the DDU do not reflect the “isolation” contemplated by the Legislature.[22] See Abrazinski, 876 F.Supp at 319 n. 9.
Although the Legislature clearly sought to end the barbaric conditions existing prior to 1955, it does not appear that its intent was as far-reaching as plaintiffs assert: the statute does not place a fifteen-day limit on any confinement which may be mentally harmful. Furthermore, DOC’s interpretation that the DDU is not an isolation unit under G.L.c. 127, §40 must be given substantial deference. Gateley’s Case, 415 Mass. 397, 399 (1993). Consequently, the defendants are entitled to summary judgment on Count III.
Count IV: Supervision
See page 19 infra.
Count V: G.L.c. 127, §§32
In Count V, plaintiffs allege that “the DOC defendants have failed to treat plaintiffs with the kindness required by their circumstances in violation of G.L.c. 127, §§32 and 39.” General Laws c. 127, §32 mandates that DOC “treat the prisoners with the kindness which their obedience, industry and good conduct merit.” In Blaney v. Commissioner of Correction, 374 Mass. 337 (1978), the court held that the purpose of the statute is to assure equal treatment “for prisoners who are not being disciplined.” Blaney, 374 Mass. at 341. Therefore, G.L.c. 127, §32 does not apply to inmates who are being disciplined such as those in the DDU.
Plaintiffs argue in rebuttal that §32 should apply to those inmates in the DDU because the unit serves a classification function, as the DSU had, and not merely a disciplinary function. Plaintiffs cite Hoffer v. Fair, S.J.C. Suffolk No. 85-71 (Judgment #11, Mar. 3, 1988), in contending that because Justice Liacos recognized that the DSU served a classification and a disciplinary function but applied §32 to the treatment of DSU inmates, this court should apply §32 to the DDU. Contrary to plaintiffs’ assertion, however, Justice Liacos recognized that “DSU placement appears to be considered as one possible response to disciplinary infractions, but not as punishment for those infractions,” Hoffer v. Fair, supra at 17, and ruled that “ [i]f DSU placement is not an integral component of the institution’s internal punishment process ... then it is appropriate to apply §32 ...” Hoffer v. Fair, supra at 40.[23] Unlike the DSU, the DDU is an integral component of the inmate punishment process. Therefore, regardless of the DDU’s ancillary classification function, G.L.c. 127, §32 does not apply.[24]
Defendants’ motion for summary judgment is allowed on Count V, without prejudice to plaintiffs asserting individual claims where declaratory judgment, injunctive relief, or damages to correct the particular inadequacies would be appropriate.
Counts VI and VII: Access to Written Materials
Plaintiffs complain that “(b]y denying plaintiffs access to educational materials and by otherwise arbitrarily restricting plaintiffs in their access to written material and the communication of ideas, the DOC defendants have violated plaintiffs’ rights under the First and Fourteenth Amendments [and under Article 16 of the Massachusetts Declaration of Rights].”[25] Defendants contend that the ban on educational and rehabilitative materials in the DDU cells is constitutional according to the four factors announced in Turner v. Sqfley, 482 U.S. 78 (1987).[26] However, the record before this court does not demonstrate that the ban on educational materials is reasonably related to legitimate penalogical interests as a matter of law. See Affidavit of E. Eugene Miller, and Lovell v. Superintendent, North Central Correctional Institution, 26 Mass.App.Ct. 35, 36-38 (1988). Consequently, summary judgment for the defendants on these counts is not appropriate.
Count VIII: 105 Code Mass. Regs. 451.212
“Unless security or safely considerations dictate otherwise, each inmate should be afforded the opportunity for recreation and exercise for personal enjoyment and physical fitness outside of his cell. . . Each inmate within the special management or disciplinary units shall be afforded not less than one hour per day, five days a week, of exercise outside his cell.” 105 Code Mass. Regs. 451.212(B). Plaintiffs seek a declaration that the DOC has violated this regulation and an injunction to prevent further violation.
Defendants admit that prior to the Fall of 1995, inmates were denied exercise as a form of punishment. This practice has since ceased, however. In fact, plaintiffs acknowledge that DDU inmates are offered outdoor exercise, one hour a day, five days per week. Consequently, the defendants assert that the plaintiffs’ claim with respect to defendants’ violation of 105 Code Mass. Regs. 451.212 is moot. See Layne v. Superintendent, MCI-Cedar Junction, 406 Mass. 156, 160 (1989).
Plaintiffs contend that their claim is not moot because the new policy does not provide for indoor exercise outside of their cells during inclement weather.[27] According to plaintiff MacDougall, he could not exercise on several occasions due to inclement weather.[28] 105 Code Mass. Regs. 451.212(B) requires the DOC to allow one hour per day of exercise. Because there is evidence that they have failed and continue to fail to provide this exercise to DDU inmates during *398 inclement weather, summary judgment is not appropriate.[29] Unless the defendants can show that security and safety considerations make indoor exercise impossible, plaintiffs may be entitled to the declaratory and injunctive relief they seek. See Amended Complaint, par. f at 35; par. 10 at 38.[30] Summary judgment on this count must be denied.
Counts IX and X: Access to the Courts
In Bounds v. Smith, 430 U.S. 817 (1977), the United States Supreme Court held that “the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.” Bounds, 430 U.S. at 828. Defendants contend that plaintiffs cannot demonstrate a systemic problem with respect to DDU inmates’ access to the courts because they are provided with adequate research time and legal resources. “Where an adequate law library is available to prisoners, courts have found that prisoners’ right of access to courts is satisfied.” Tolbert v. DuBois, Superior Court C.A. No. 95-3862, 5 Mass. L. Rptr. 328 (Middlesex, April 29, 1996), citing Bounds, 430 U.S. at 824. “At least where an adequate library exists, however, there is no separate right to the assistance of trained staff.” Tolbert v. DuBois, supra at 3, citing Bounds, 430 U.S. at 828. “[A]s long as books are reasonably available, there is no constitutional right to have them in a given place or to have them constantly at the ready.” Tolbert v. DuBois, supra at 4.
Plaintiffs rely principally on the affidavits of Adrian Almeida, Mark MacDougall, Charles Chase, and Keith Parkinson to demonstrate that the DOC does not provide the DDU inmates with sufficient legal materials, research time, or photocopying services. These affidavits raise issues of material fact regarding deficiencies in these inmates’ access to the courts.
However, notwithstanding this dispute, plaintiffs must produce evidence of system-wide injury in order to succeed on their systemic challenge. The Supreme Court recently elaborated on Bounds in Lewis v. Casey, 116 S.Ct. 2174 (1996). In Lewis, the Court ruled that “the success of [the inmates’] systemic challenge was dependent on their ability to show widespread actual injury . . .” Lewis, 116 S.Ct. at 2179. Thus, if the plaintiffs do not demonstrate widespread actual injury, “[t]he remedy must of course be limited to the inadequacy that produced the injury-in-fact that the plaintiffis] ha[ve] established.” Lewis, 116 S.Ct. at 2183.
Only four plaintiffs have presented evidence of actual injury in connection with existing or contemplated litigation.[31] This evidence is insufficient to establish widespread actual injury sufficient to deny summary judgment for the defendants on Counts IX and X. The plaintiffs’ evidence is sufficient, however, to allow these plaintiffs to proceed with their individual claims. If they succeed in demonstrating that they have sustained injury related to an existing or contemplated non-frivolous claim, and that the injury is the result of DOC’s failure to provide adequate access to adequate law libraries or assistance from persons trained in the law, then declaratory judgment or injunctive relief to correct the particular inadequacies which caused their injuries would be appropriate.
CountXI: G.L.c. 12, §§11H and 111
Defendants maintain that the plaintiffs cannot meet their burden to demonstrate that their rights under the Massachusetts Civil Rights Act, G.L.c. 12, §§11H and 1II, have been violated. Plaintiffs have not adduced facts to show that the named defendants have coerced, threatened, or intimidated them. However, according to the affidavit of Keith Parkinson, corrections officers threatened that if Parkinson complained about the meals, he would be denied food and if he continued to ask to see a doctor, he would receive a disciplinary report. According to the affidavit of Corey Glover, he was told by corrections officers that if he filed suit against them he would be physically harmed.
There is no respondeat superior liability for G.L.c. 12, §§11H and 111 violations, however. See Lyons v. National Car Rental Systems, Inc., 30 F.3d 240, 244-47 (1st Cir. 1994), and cases cited. Although plaintiffs have submitted evidence that their rights have been violated, plaintiffs have not provided evidence that the named defendants, themselves, interfered with the plaintiffs’ rights through threats, intimidation, or coercion. Further, “[a] direct violation of a persons’s rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act.” Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). Thus, the establishment and operation of the DDU and the conditions of plaintiffs’ confinement, even if violative of their rights, does not implicate the Massachusetts Civil Rights Act.
Qualified Immunity
Plaintiffs seek relief against the DOC defendants through G.L.c. 12, §§11H and 111, the Massachusetts Civil Rights Act, and through 42 U.S.C. §1983. Plaintiffs seek damages as well as injunctive and declaratory relief. Because this action has been bifurcated, this decision is aimed principally at plaintiffs’ claims for declaratory relief. The individual defendants have moved for summary judgment based on qualified immunity with respect to plaintiffs’ claims for damages under G.L.c. 12, §§11H and 111 and 42 U.S.C. §1983, however.[32] Because qualified immunity under these statutes provides immunity from suit and not merely from liability, see Breault v. Chairman of the Board of Fire Commissioners of Springfield, 401 Mass. 26, 31 and 34-35 n. 9 (1987), cert. denied, 485 U.S. 906 (1988), the question of its application affects not only the damages issue but also the propriety of the action itself. Therefore, it is appropriate, and not in deroga *399 tion of the Case Management Order, to address the issue here.
The doctrine of qualified immunity applies to claims under G.L.c. 12, §§111 and 11H, as well as to 42 U.S.C. §1983. Duarte v. Healy, 405 Mass. 43, 46 (1989). But it applies only to discretionary functions. Duarte, 405 Mass. at 47 citing Dobos v. Driscoll, 404 Mass. 634, 646 (1989), cert. denied, 493 U.S. 850 (1989). Plaintiffs argue that they are challenging the daily operation of the DDU which is non-discretionary. However, plaintiffs have not attacked particular acts of the defendants except to the extent that they have alleged that the regulations promulgated and the procedures followed by the defendants violate plaintiffs’ rights. These acts are clearly discretionary. See Duarte, 405 Mass. at 48 citing Davis v. Scherer, 468 U.S. 183 (1984) (where a law does not “specify the precise action that the official must take in each instance!,] it creates only discretionary authority”). See also Duarte, 405 Mass. at 48 n. 3 (distinguishing discretionary functions under G.L.c. 258).
Consequently, defendants are not individually liable “unless their actions violated [plaintiffs’] rights that were ‘clearly established’ under the relevant law.” Duarte, 405 Mass. at 48. “[Plaintiffs must show that the defendants directly participated in violating [these] rights.” O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 142 (1993). Further, plaintiffs’ rights must be clearly established so that a reasonable official would understand that his or her acts violate those rights. See id. and cases cited. See also Breault, 401 Mass. at 26 (immunity withheld if officials intentionally violate G.L.c. 12, §§111 and 11H).
Plaintiffs cite Madrid v. Gomez, 889 F.Supp. 1146 (N.D.Cal. 1995), to support their blanket contention that inmates cannot be held in conditions which put them at severe risk of mental illness. However, “there is no static test for determining whether the conditions of an inmate’s confinement are ‘cruel and unusual’ . . .” Morris v. Travisono, 549 F.Supp. 291, 294 (D.R.I. 1982), aff'd 707 F.2d 28 (1st Cir. 1983). “The term ‘cruel and unusual punishment’ is relative rather than absolute.” Davenport v. DeRobertis, 844 F.2d 1310, 1315 (7th Cir. 1988), cert. denied, 488 U.S. 908 (1988). Extended segregated confinement is not unconstitutional per Travisono, 449 F.Supp. 149, 160 (D.R.I. 1980).
In the cases upon which plaintiffs rely, the conditions were not identical to those in the DDU. See e.g. Morris, 549 F.Supp. at 292 (no visitors, one book per week); Davenport, 844 F.2d at 1314 (not clear error to hold one hour per week of exercise falls below Eighth Amendment standards); Madrid, 889 F.Supp. at 1161-71 (overwhelming evidence of excessive force, use of fetal restraints, and cagings), Madrid, 889 F.Supp. at 1228-29 (no windows in cells, walled exercise areas). Thus, it has not been clearly established that conditions such as those in the DDU violate inmates’ rights. Consequently, a reasonable official, in the position of the defendants, would not understand that his acts, in establishing the conditions of the DDU, violated plaintiffs’ rights.[33]
This conclusion is not contrary to the ruling that a question of fact exists whether defendants violated the plaintiffs’ Eighth Amendment rights. Although there is evidence that defendants were indifferent to a risk of substantial harm as required for an Eighth Amendment claim, see Farmer, 114 S.Ct. at 1977, because it is not clear what constitutes cruel and unusual punishment, defendants did not violate a known right. See McGuinness v. DuBois, 893 F.Supp. 2, 3 (D.Mass. 1995) (although deprivation of exercise may constitute a violation of the Eighth Amendment, “the state of the law in this area does not clearly establish that the conditions of [plaintiffs] confinement violated the Constitution. The defendants are therefore entitled to qualified immunity . . .”) (Emphasis added).
State Sovereign Immunity
Although the Eleventh Amendment does not apply to suits brought in State courts, a state agency or a state official in an official capacity may not be sued for retrospective relief under § 1983 because a State is not a “person” under that statute. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 70 (1989). Prospective relief is available, however. Will, 491 U.S. at 71 n. 10. See also Martin A. Schwartz & John E. Kinklin, 1 Section 1983 Litigation, 2nd ed. (1991) §8.14.
In Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71 (1992), the court held that the State is not a “person” under the State Civil Rights Act. Id. at 76. Thus, G.L.c. 12, §§11H and 111 did not abolish sovereign immuniiy. Id. at 80. See also Converse Const. Co., Inc. v. Mass. Bay Transp. Auth., 899 F.Supp. 753, 762 (D.Mass. 1995) [34]
In light of the bifurcation of this action, it may seem premature to point out that plaintiffs are not entitled to damages against the defendants in their official capacities. It is appropriate, however, because, unless plaintiffs’ claims for damages are viable, their claims for declaratory relief are moot. In sum, because there is sovereign immunity, if at trial it is determined that defendants are individually entitled to qualified immunity, plaintiffs will have no viable claims for damages, thus rendering several plaintiffs’ claims for declaratory relief moot.
Counts XII and XIII: Federal and State Due Process Claims
Counts XII and X3II assert violations of procedural due process. Plaintiffs assert that the administrative disciplinary process on its face and as applied violate plaintiffs’ federal and state due process rights.
Plaintiffs contend that inmates repeatedly have not been given notice of disciplinary hearings or were prevented from attending their own hearing. (Almeida Aff., par. 11; Bunce Aff., pars. 2-5; Chase Aff., pars. *400 7-9.) DDU inmates have been denied the opportunity to present evidence and witnesses. (Bunce Aff., par. 6; MacDougall Aff., par. 15.) Almeida, Bunce and Chase all experienced being given written notice of a hearing which they were not given an opportunity to attend. (Almeida Aff., par. 11; BunceAff., pars. 2-5; Chase Aff., pars. 7-9.)
In Almeida v. DuBois, Norfolk Sup. No. 94-2828-B (Jan. 18, 1996), Judge Dortch-Okara found that Almeida’s due process rights were violated at two “special” disciplinary hearings by denial of his right to present four inmate witnesses and denial of an opportunity to make an oral statement, resulting in his being sentenced to the DDU. Almeida, at 6, 9.
At a November 1992 hearing, Bunce was denied the opportunity to present evidence on his own behalf, without any justification being given for the denial. Each time Bunce tried to speak, Special Hearing Officer Sherwin cut him off, telling him to “shut up.” (Bunce Aff., par. 6.) Bunce was sentenced to the DDU after this hearing.
Plaintiff MacDougall was denied the opportunity to present witnesses without being given a justification for the denial. Prior to the hearing, in conformance with DDU policy, he had requested the presence of a corrections officer as a witness. The C.O. did not appear at the hearing and the report in connection with the hearing falsely indicated that MacDougall did not request any witnesses. MacDougall received a two year DDU sanction.
A. Federal Due Process Claims
In Sandin v. Conner, 115 S.Ct. 2293 (1995), respondent was an inmate who brought a civil rights action against prison officials and the state of Hawaii challenging the imposition of disciplinary segregation for misconduct. Conner alleged that prison officials deprived him of procedural due process when an adjustment committee refused to allow him to present witnesses during a disciplinary hearing and then sentenced him to segregation for misconduct. Sandin, 115 S.Ct. at 2294.
In its opinion the Supreme Court revisited Hewitt v. Helms, 459 U.S. 460 (1983), and determined that Hewitt produced two undesirable effects. First, that it created “disincentives for States to codify prison management procedures in the interest of uniform treatment. Prison administrators need be concerned with the safety of the staff and inmate population. Ensuring that welfare often leads prison administrators to curb the discretion of staff on the front line who daily encounter prisoners hostile to the authoritarian structure of the prison environment. Such guidelines are not set forth solely to benefit the prisoner. They also aspire to instruct subordinate employees how to exercise discretion vested by the State in the warden, and to confine the authority of prison personnel in order to avoid widely different treatment of similar incidents. The approach embraced by Hewitt discourages this desirable development: States may avoid creation of ‘liberty’ interests by having scarcely any regulations, or by conferring standardless discretion on correctional personnel.” Sandin, 115 S.Ct. at 2299.
Second, the Supreme Court determined that “the Hewitt approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little off-setting benefit to anyone. In so doing, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.” Sandin, 115 S.Ct. at 2299.
The Supreme Court concluded that, “(t]he time has come to return to the due process principles we believe were correctly established and applied in Wolff and Meachum Sandin, 115 S.Ct. at 2300. The Court held that the States may still create liberty interests that afford prisoners Federal due process protections, but explained: ‘[T]hese interest will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . .. nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison Ufe.’ ” (Emphasis added.) Sandin, 115 S.Ct. at 2300.
“By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges ... Not only are . . . regulations not designed to confer rights on inmates, but the result of the negative implication jurisprudence is not to require the prison officials to follow the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature.” Sandin, 115 S.Ct. at 2299.
The United States Court of Appeals for the First Circuit in Dominique v. Weld, 73 F.3d 1156 (1st Cir. 1996), applied the holding of the Sandin opinion to an inmate who was removed from a prerelease facility despite his good standing in a work-release program and transferred to the Massachusetts Coixectional Institution, at Shirley, a medium-security facility. Hastings v. Commissioner of Correction, 424 Mass. 46, 51, 52 (1997); citing Dominique, 73 F.3d at 1159. “The court held that the removal and transfer did not, in the words of the Sandin case, constitute an ‘atypical hardship,’ and, consequently, no Federal right of due process had been violated.” Hastings, 424 Mass. at 52.
In the present case, plaintiffs’ federal due process claims are foreclosed by Sandin and Dominique. The facts alleged by the plaintiffs do not support any claim of system-wide violations of plaintiffs’ federal or state due process rights by the defendants.
*401 B. State Due Process Claims
Prison disciplinary proceedings must comport with certain minimal requirements. “(D]ue process requires that before a prisoner can be deprived of a State-created liberty interest he must be given advance written notice of the alleged violation of the disciplinary rules, he must be accorded impartial tribunal, and must be given ‘a written statement by the fact finders as to the evidence relied upon and the reasons for the disciplinary action taken.’ . . . The Court also stated that an inmate should be allowed to call witnesses if to do so will ‘not be unduly hazardous to institutional safety or correctional goals.’ A disciplinary board, at its discretion, may refuse to call a witness requested by an inmate on the grounds of ‘irrelevance, lack of necessity, or the hazards presented in individual cases.’ ” Nelson v. Commissioner of Correction, 390 Mass. 379, 389, 390 (1983).
Defendants assert that twenty-four hours’ notice of a prison disciplinary hearing is constitutionally sufficient notice. O’Malley v. Sheriff of Worcester County, 415 Mass. 132, 140 n. 12 (1993). Further, DOC regulations require that inmates receive at least twenty-four hours’ notice prior to a disciplinary hearing. 105 C.M.R. 430.11(2).
Further, “[c]onfrontation and cross-examination of adverse witnesses may create a high risk of reprisal in a prison system; hence, the Supreme Court has left the exercise of the right to confrontation and cross-examination in disciplinary hearings to the discretion of prison officials.” Nelson v. Commissioner of Correction, 390 Mass. at 390.
In Hastings v. Commissioner of Correction, 424 Mass. 46 (1997), the plaintiffs, six inmate serving life sentences for convictions of murder in the second degree, sought injunctive and declaratory relief, damages, and attorneys fees in connection with an administrative order of the Commissioner of Correction. The order transferred all inmates serving life sentences, who had been denied parole two or more times, from prerelease facilities to higher security institutions. Plaintiffs contended, that among other violations, the order violated their due process rights under the Federal and State Constitutions. Defendants’ motion for summary judgment was allowed and plaintiffs’ cross-motion for summary judgment was denied. On appeal, the SJC concluded that summary judgment was proper. Hastings, 424 Mass. at 47.
In Hastings, the Supreme Judicial Court determined that, where the commissioner’s administrative order does not affect the duration of plaintiffs’ sentences or subject them to conditions different from those customarily applied to other inmates serving similar sentences for the same type of crime, plaintiffs “cannot claim a liberty interest in continuing in work-release programs sufficient to su[p]port a claim under the State Constitution that they were entitled to due process before what essentially constitutes a privilege could be revoked.” Hastings, 424 Mass. at 52.
Accordingly, plaintiffs have no claim. Plaintiffs claims based on state due process laws must fail.
C. Statute of Limitations
To challenge their disciplinary proceedings and vindicate their state-based claims, the individual plaintiffs should have brought an action in the nature of certiorari within sixty days of the final decision.[35] See Pidge v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 32 Mass.App.Ct. 14, 17 (1992); G.L.c. 249, §4. Their failure to do so is fatal to their State-based due process claims. Pidge, 32 Mass.App.Ct. at 17, 18.[36]
“The right to bring an action in the nature of certiorari for the failure of prison officials to adhere to Department of Correction regulations exists only by virtue of the certiorari statute, G.L.c. 249, §4.” Ford v. Commissioner of Correction, 27 Mass.App.Ct. 1127, 1129 (1989). This statute had included a requirement that actions brought pursuant to it be commenced within two years of the proceeding being challenged. This was shortened to sixty days by St. 1986, c. 95. “The legislative intent to impose a shortened period for bringing claims of this nature is evident from the 1986 amendment . . . reducing the limitations period to sixty days.” Ford, 27 Mass.App.Ct. at 1129. “[G]iven the vast number of prison disciplinary proceedings, it is reasonable to require such claims to be brought promptly so that prison officials may respond while they still have some memory of the relevant events and may retry serious infractions if the proceedings complained of were procedurally inadequate.” Ford, 27 Mass.App.Ct. at 1129.
However, as the Appeals Court stressed in Pidge, 32 Mass.App.Ct. at 19, itis doubtful that the sixty-day limitations period of G.L.c. 249, §4 may cut off a Federal law claim which, under Federal law, would have a longer limitations period. Although there is no Federal liberty interest regarding disciplinary isolation, see O’Malley, 415 Mass. at 136; Parenti v. Ponte, 727 F.2d 21, 23 (1st Cir. 1984); contrast e.g. Wolff, 418 U.S. at 546, (liberty interest in loss of good-time credits earned),[37] the liberty interest created by State law “acquires the protection of the Fourteenth Amendment.” Smith v. Massachusetts Dept. of Correction, 936 F.2d 1390, 1396 (1st Cir. 1991), citing Hewitt v. Helms, 459 U.S. 460, 466 (1983). The Fourteenth Amendment claims of these three plaintiffs are, therefore, not barred by the sixty-day limitation of G.L.c. 249, §4. [38] See Pidge, 32 Mass.App.Ct. at 19.
Though plaintiffs’ federally based due process claims may not be barred by the 60 day statute of limitations, plaintiffs’ federal due process claims are foreclosed by the decisions reached in Sandin and Dominique. The facts alleged by the plaintiffs do not support any claim of system-wide violations of *402 plaintiffs’ federal or state due process rights by the defendants.
D. Challenges to the Regulations
Plaintiffs first challenge the administrative disciplinary procedure set forth in 103 Code Mass. Regs. 430.11.[39] “It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking, . . . and ‘the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.’ ” Hastings, 424 Mass. at 49. Further, declaratory judgment is the proper vehicle for determining the validity of an administrative regulation. See Nelson v. Commissioner of Correction, 390 Mass. 379, 386-88 (1983); Averett v. Commissioner of Correction, 25 Mass.App.Ct. 280, 287 (1988), rev. granted, 402 Mass. 1102, rev’d on other grounds, 404 Mass. 28 (1989).
Plaintiffs assert that the regulation is constitutionally flawed because a prisoner may have as little as twenty-four hours notice of a disciplinary hearing. But twenty-four hours notice is not constitutionally inadequate on its face. See Wolff v. McDonnell, 418 U.S. 539, 504 (1974); O’Malley v. Sheriff of Worcester of County, 415 Mass. 132, 134-40 (1993). Further, the regulation allows an inmate to seek a continuance for good cause which provides additional due process protection. Plaintiffs have adduced no evidence to suggest that they have been denied continuances when necessary to prepare adequately for a disciplinary hearing. Consequently, plaintiffs cannot demonstrate that the twenty-four hour notice provision is invalid.
Plaintiffs next allege that the DOC regulations violate due process because they do not contain standards to determine which prisoners should be confined to the DDU. However, only prisoners who have been found guilty of a major disciplinary infraction may be sentenced to the DDU. If plaintiffs contend that due process requires standards to differentiate among inmates who have been found guilty of major violations to determine the propriety of a DDU sanction, they neither cite authority for that contention nor provide evidence that defendants have unfairly differentiated among such prisoners.[40] Further, the DOC has promulgated guidelines for determining whether an offense is major or minor. See 103 Code Mass. Regs. 430.09(4).
Plaintiffs challenge the failure of the regulations to guarantee counsel or provide a right to confront and cross-examine witnesses. However, it is clear that due process under the Fourteenth Amendment does not require such provisions in prison disciplinary proceedings. See Wolff, 418 U.S. at 570. Further, plaintiffs cite and this court is aware of no such rights provided by State law. See generally Murphy v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 396 Mass. 830, 832 (1986); O’Malley, 415 Mass. at 138. Plaintiffs’ claims that the regulations do not provide for compulsory process and other amorphous-attacks are similarly unavailing.
E. Challenges to Implementation of Disciplinary Procedures
Plaintiffs further allege that defendants have violated their federal and state due process rights by failing to implement their disciplinary procedures properly. However, only three of the eleven plaintiffs, which constitutes a small percentage of the DDU population, have provided evidence of constitutional infirmities in their disciplinary proceedings.[41] All three inmates have been released from the DDU. Moreover, these isolated incidents do not establish a common DOC practice “involving violations of rights, which [is] consistent and repeated in nature,” and are therefore not properly resolved through this declaratory judgment action. Nelson, 390 Mass. at 388 n. 12; G.L.c. 231A, §2.
“In Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court held that inmates placed in administrative segregation prior to a disciplinary hearing have certain limited due process rights: Prison officials are ‘obligated to engage only in an informal, non-adversary review of the information supporting [the prisoner’s] administrative confinement, including whatever statement [the prisoner] wished to submit, ■within a reasonable time after confining him to administrative segregation.’ ” Leacock v. DuBois, et al., (United States District Court, District of Massachusetts, Civil Action No. 93-12236-GAO) (OToole, J.) (1996). Minimum due process includes: “(1) written notice of the claimed violation; (2) a qualified right to call witnesses and present evidence in response to the claim; and (3) a written statement of the factfinders as to the evidence relied upon and the reasons for the action.” Leacock v. DuBois, supra.
In the present case, Almeida, Bunce and Chase were allegedly given written notice of a hearing which they were then not permitted to attend. (Almeida Affidavit, par. 11; Bunce Affidavit, pars. 2-5; Chase Affidavit, pars. 7-9.) Judge Dortch-Okara found that Almeida’s due process rights were violated at two “special” disciplinary hearings, which resulted in his being sentenced to the DDU. Adrian Almeida v. Larry E. DuBois, et al., Norfolk Sup. No. 94-2828-B (Jan. 18, 1996). Further the court found that Almeida was denied an opportunity to make an oral statement in violation of his due process rights. (Id at 6.)
Bunce was denied the opportunity to present evidence in his own behalf at a hearing held on November 7, 1992. No justification was given for the denial. Each time he tried to speak, Special Hearing Officer Sherwin cut him off, telling him to “shut up.” (Bunce Affidavit, par. 6.) Bunce was then sentenced to the DDU. MacDougall was denied the opportunity to present witnesses without being given a justification for the *403 denial. (MacDougall Affidavit, par. 15.) MacDougall received a two year DDU sanction and his appeal was denied. (Id.)
F. Res Judicata
The defendants contend that the plaintiffs’ due process claims are barred by principles of res judicata because they could have been litigated through the administrative process, see Gloucester Marine Railways Corp. v. Charles Parisi, Inc., 36 Mass.App.Ct. 386, 391 (1994), rev. denied, 418 Mass. 1104, and Almeida v. Travelers Ins. Co., 383 Mass. 226, 230 (1981) (administrative decisions are binding and conclusive on the parties), and because plaintiffs did not bring an action in the nature of certiorari within sixty days of Maloney’s denial of their appeal.[42] But plaintiffs allege due process violations in the regulations themselves and in DOC’s application of the regulations.[43]
“[T)he crucial question is not when judicial review is sought but why it is sought.” Averett v. Commissioner of Correction, 25 Mass.App.Ct. 280, 287 (1988), reversed on other grounds in 404 Mass. 28 (1989). A complaint for declaratory relief is not “an appropriate remedy where the validity of an adjudication by the board in an individual case is being challenged.” However, it “is an appropriate way of testing the validity of regulations or the propriety of practices involving violations of rights, which are consistent and repeated in nature." Averett, 25 Mass.App.Ct. at 287, quoting Nelson v. Commissioner of Correction, 390 Mass. 379, 388 n. 12 (1983). “The importance of the distinction is not found in the label attached to the pleading, that is, declaratory relief under G.L.c. 231A, certiorari pursuant to G.L.c. 249, §4, . . . rather, the nature of the grievance will determine the scope of judicial review.” Averett, 25 Mass.App.Ct. at 287. “(N]o matter the description given the action by the defendant, the question to be answered is whether the board’s decision is supported by substantial evidence.” Averett, 25 Mass.App.Ct. at 287. The inmate is not entitled to a hearing de novo in the Superior Court on the propriety of the conduct of his individual disciplinary hearing. Averett, 25 Mass.App.Ct. at 287.
In the present case, the Superior Court decided to bifurcate plaintiffs’ declaratory judgment claims, which allege systemic claims against the DDU, from plaintiffs’ individual claims for injunctive and compensatory relief. The Court did this in order to provide what it considered to be a “superior method for the fair and efficient adjudication of the controversy" raised by the putative class action, without “prejudicing] any member of the putative class.” (Case Management Order, p.2.) A controversy exists regarding the constitutionality of the disciplinary mechanism that resulted in plaintiffs’ confinement to the DDU. Defendants’ arguments for dismissal of aspects of plaintiffs’ due process claims are deferred since, under the circumstances stated above, they are not subject to the 60 day statute of limitations applicable to certiorari actions.
CONCLUSION
In 1955, the Governor of the Commonwealth of Massachusetts sent a message to the Senate and House of Representatives with recommendations relative to reorganizing the correctional system of the Commonwealth. The Governor had commissioned a special committee to study the Massachusetts penal system and to submit their report.
According to the report, the philosophy behind the use of isolation and solitary confinement at Concord was without basis, and the methods used were antiquated and ineffective as correctional procedures. (Message from His Excellency the Governor Submitting Recommendations Relative to Reorganizing the Correctional System of the Commonwealth, Senate— No. 750 at 43 (June 9, 1955).) Recognition was conceded for the need to segregate certain non-conformists and recalcitrant inmates, but the report “deplored the widespread use of the dark cell and bread and water.” Id. “Experience proves that reversion to the use of these barbaric methods is the ‘easiest way out,’ or the line of least resistance.” Id.
The Commonwealth has progressed since its use of dark cells. The DDU is, at best, a clean and modern facility. However, the sterile environment of the DDU, and the extended periods of time in which inmates are often confined to the DDU can induce or aggravate a state of mental illness in the condition of some inmates.
In the present case, plaintiffs’ complaints and the relief sought are based on assertions of systemic violations. In so far as defendants’ motion for summary judgment has been allowed, plaintiffs may assert nonetheless individual claims where declaratory judgment, injunctive relief, or damages to correct the particular inadequacies they have alleged would be appropriate.
ORDER
For the foregoing reasons, with respect to the defendants’ Motion for Summary Judgment as to all Counts, it is hereby ORDERED that:
1. Count I — violations of the Eighth and Fourteenth Amendments of the United States Constitution — 42 U.S.C. §1983, insofar as it alleges that defendants have deliberately created an environment of sensory deprivation defendants know is likely to cause mental and physical harm to DDU inmates; and defendants encouraged use of excessive force by corrections officers against inmates. It is ORDERED that defendants’ motion for summary judgment is ALLOWED regarding the claim of inadequate medical treatment, without prejudice to plaintiffs who may assert individual claims for injury suffered as a result of inadequate medical treatment; ALLOWED as to plaintiffs’ claim of use of excessive force, without prejudice to plaintiffs *404 who may assert claims against individual correctional officers for use of excessive force; and DENIED as to plaintiffs’ claim of inadequate food as it pertains to medically prescribed quantities of food.
2. Count II — violations of Article 26 of the Massachusetts Declaration of Rights, insofar as it alleges that confinement of DDU inmates by DOC defendants for extended periods of time under conditions in which defendants deliberately created an environment of sensory deprivation defendants know is likely to cause mental and physical harm to DDU inmates, constitutes cruel or unusual punishment, is ALLOWED;
3. Count III — insofar as it alleges that defendants committed violations of G.L.c. 127, §40 by confining prisoners in the DDU for longer than fifteen days is, ALLOWED;
4. Count TV — insofar as it alleges that defendants committed violations of G.L.c. 127, §39 by defendants’ failure to provide periodic medical and psychiatric examinations to DDU inmates, or to provide the treatment that would have been indicated if DOC defendants had done so, is DENIED;
5. Count v. — insofar as it alleges that defendants have failed to treat plaintiffs with the kindness required by their circumstances in violation of G.L.c. 127, §§32 and 39 by denying plaintiffs’ rights to due process in the disciplinary hearing process, by denying food and medicine, and by confining plaintiffs in the DDU for extended periods of time, is ALLOWED, without prejudice to plaintiffs asserting individual claims where declaratory judgment, injunctive relief, or damages to correct the particular inadequacies would be appropriate;
6. Count VI — insofar as it alleges that defendants are in violation of the First and Fourteenth Amendments to the Constitution of the United States — 42 U.S.C. §1983 by denying plaintiffs access to educational materials, and arbitrarily restricting plaintiffs in their access to written material and communication of ideas, is DENIED;
7. Count VII — insofar as it alleges that defendants are in violation of Article 16 of the Massachusetts Declaration of Rights by denying plaintiffs access to all educational materials and restricting plaintiffs’ access to written material and the communication of ideas, is DENIED;
8. Count VIII — insofar as it alleges that defendants are in violation of the Department of Public Health Regulations Governing Correctional Institutions- — 105 C.M.R. 451.212 by denying plaintiffs of at least one hour per day, five days a week, of exercise outside the cell, is DENIED;
9. Count IX — insofar as it alleges that defendants are in violation of United States Constitution- — 42 U.S.C. §1983 by denying plaintiffs’ access to the courts and access to an adequate law library or adequate assistance from persons trained in the law, is ALLOWED, without prejudice to plaintiffs asserting individual claims where declaratory judgment, injunctive relief, or damages to correct the particular inadequacies would be appropriate;
10. Count X — insofar as it alleges that defendants are in violation of Article XI of Massachusetts Declaration of Rights by denying plaintiffs’ access to the courts and access to an adequate law library or adequate assistance from persons trained in the law, is ALLOWED, without prejudice to plaintiffs asserting individual claims where declaratory judgment or injunctive relief to correct the particular inadequacies would be appropriate;
11. Count XT — insofar as it alleges that defendants are in violation of G.L.c. 12, §§11H and 111 — Massachusetts Civil Rights Act, alleging that DOC defendants, and persons under their supervision, have interfered with plaintiffs enjoyment of rights secured by the laws of the Commonwealth, the Constitutions of the United States and the Commonwealth, through the use of threats, intimidation or coercion, is ALLOWED, without prejudice to the individual plaintiffs asserting claims against individual corrections officers;
12. CountXII — insofar as it alleges that defendants are in violation of due process under the Fourteenth Amendment to the United States Constitution — 42 U.S.C. §1983 by denying plaintiffs’ constitutional rights to due process by the procedure for sentencing inmates to DDU, and imposition of disciplinary measures once in the DDU, is ALLOWED;
13. Count XIII — insofar as it alleges that defendants are in violation of plaintiffs’ right to due process under the Massachusetts Declaration of Rights by denying plaintiffs their constitutional rights to due process in the procedure by which prisoners are sentenced to the DDU, and by the imposition of disciplinary measures once in DDU in violation of Part II. c. 1. §1 Article 4 of the Massachusetts Constitution and Articles 1, 10, and 12 of the Massachusetts Declaration of Rights, is ALLOWED.
Plaintiffs cross-motion for Summary Judgment for Count IV, insofar as it alleges that defendants are in violation of G.L.c. 127, §39 for failure to provide periodic medical and psychiatric examinations to DDU inmates or to provide the treatment that would have been indicated if DOC defendants had done so, is ALLOWED.
*407 Appendix A
Alston v. Fair, D. Mass. Civil No. 77-3519-G
ORDER CONCERNING THE DMH’S SUPERVISION OF MEDICAL ANDPSYCHLATRIC CARE FOR INMATES IN SEGREGATED UNITS AT MCI, WALPOLE
Section II
DMH Supervision of Medical and Psychiatric care in Segregated Units
The DMH shall supervise the provision of periodic medical and psychiatric examinations and treatments to inmates confined to segregated units at MCI, Walpole as follows:
A.Protocols
The DMH shall within ten days of this Order issue under G.L.c. 127, §39, protocols for the provision of periodic medical and psychiatric examinations and treatments to inmates confined to segregated units at MCI, Walpole. The DMH protocols issued pursuant to this Order shall provide as follows with respect to “segregated units” as defined in this Order:
1. The DOC shall forthwith provide the DMH with a list of all currently segregated units and thereafter with any changes in the list.
2. The DOC shall within three months provide the DMH with proposed written procedures for the provision of periodic medical and psychiatric examinations and indicated medical and psychiatric treatment to inmates in segregated units. The DMH shall review the proposed procedures and prepare a written report of their adequacy, stating separately for each proposed procedure whether it is approved, and if not, how it must be changed to obtain approval. The DMH shall solicit and consider the comments of plaintiffs’ counsel and experts before approving any proposed procedures. The DOC’s written procedures governing the provision of periodic and medical psychiatric examinations and indicated medical and psychiatric treatment to inmates in segregated units must be approved by the DMH and adopted and implemented by the DOC within six months. Any changes in those written procedures shall be subject to written approval by the DMH.
3. The DOC shall promptly provide the DMH with a list of the physicians and psychiatrists responsible for the provision of medical and psychiatric care to inmates in segregated units, and thereafter with any changes in the list. The DOC shall supply the DMH with copies provided to inmates in segregated units.
4. The DOC shall each month prepare and submit to the DMH a written report listing for each inmate confined to a segregated unit for any time during the preceding month, his name or identifying number, the dates he received medical or psychiatric examination or treatment, and the type of medical or psychiatric examination or treatment he received.
B.Inspections
At least twice each year, the DMH shall inspect MCI, Walpole, including records of confinement of inmates in segregated emits and records of the provision of medical and psychiatric examinations and treatments given to inmates in segregated units, and determine whether the DOC has achieved and maintained compliance with the DMH’s protocols and has given adequate periodic medical and psychiatric examinations and indicated medical and psychiatric treatment to inmates in segregated units. The first inspection shall be made by September 30, 1981.
C.Reports
1. The DMH shall prepare a comprehensive, detailed written report of each inspection, stating separately for each provision of the protocols the extent and manner in which the DOC has or has not achieved compliance with the protocols and stating the extent and manner, if any, in which the DOC is in the opinion of the DMH failing to provide periodic medical or psychiatric examinations or indicated medical or psychiatric treatment to inmates in segregated units. The DMH shall provide the DOC with copies of each inspection report prepared by the DMH. In addition, the DMH shall provide plaintiffs’ counsel during the pendency of this action with copies of each inspection report prepared by the DMH, each plan of correction prepared by the DOC, and each reply or notice of persistent deficiencies prepared by the DMH, or any other inter-agency communications prepared in connection with the DMH inspection described in Part II *408 of this Order or relating in any way to the supervision by the DMH of the DOC’s provision of medical and psychiatric care to inmates in segregated units.
2. The DMH defendants shall on or before November 15, 1981, file in the court a detailed written report of their compliance with the provisions of Part II of this Order, stating separately for each of those provisions the manner in which compliance has been or has not been achieved and the manner in which compliance will be achieved.

 By stipulation, defendants may agree to accept the admissibility of evidence as to persons other than the named plaintiffs when relevant to prove the existence of the alleged unlawful practices or procedures that the plaintiffs claim had adversely affected them. Williams v. Secretary of the Executive Office of Human Services, 414 Mass. 551, 554 n. 4 (1993) (action brought on behalf of homeless and mentally ill individuals that failed to demonstrate that the practices and policies of the DMH in allocating its resources discriminated against individuals with disabilities in violation of the ADA; the Court determined that DMH defendants were entitled to summary judgment on those claims). Further, the Court determined that, “(i]n declaratory actions, even where relief is denied, the rights of the parties must be declared.” Id. at 570.

 The order states that “a speedy trial on the named plaintiffs’ declaratory judgment claims would be a superior method for the fair and efficient adjudication of the controversy and will not prejudice any member of the putative class . . . Notice ... shall be given to members of the putative class . . .” including all those who were confined to the DDU at the time the action was commenced and those who are currently or will soon be confined to the DDU.

 The motions before this court and this memorandum of decision are therefore directed principally at plaintiffs’ claims for declaratory and injunctive relief.

 Mary Lou Sudders (“Sudders”) replaced Eileen Elias (“Elias") as DMH Commissioner after this suit had been filed. Elias was named both individually and in her official capacity. Plaintiffs have not moved for summary judgment against Elias individually.

 As of March 18, 1996, three of the eleven plaintiffs were still confined to the DDU: Charles Chase, William Dinkins, and Keith Parkinson. (McCrosson Aff., Ex. 4, par. 7.) Mark MacDougall was released from DOC custody on March 16, 1996. (McCrosson Aff., Ex. 4, par. 7(F).)

 See, e.g., Williams v. Secretary of the Executive Office of Human Services, 414 Mass. 551, 554 n.4 (1993), where the defendants agreed to the following: (1) to waive defenses based on the statute of limitations through the date of final judgment in the case as to any subsequent plaintiff whose claim for declaratory or injunctive relief is based on the same factual elements which the plaintiffs are required to prove in order to show entitlement to relief, provided that the subsequent claimant’s claim was not already barred prior to a certain date; (2) to be bound by the Superior Court’s judgment regarding the existence and scope of any statutory, regulatory, common law, or constitutional rights as to any subsequent similarly situated claimant; (3) to be bound by any judgment of the Superior Court regarding the legality or illegality of any practice or procedure as to any similarly situated claimant adversely affected by such practice or procedure; (4) not to argue mootness based on the plaintiffs’ current situation, so long as there remains a risk that the plaintiffs might be subjected to the challenged practices; and (5) to accept the admissibility of evidence as to persons other than the named plaintiffs when relevant to prove the existence of the alleged unlawful practices or procedures that the plaintiffs claim have adversely affected them.

 The summary judgment record includes the Statement of Agreed Facts, affidavits, and excerpts of deposition transcripts submitted by the parties.

 It should be noted, however, that the DDU has only been operating since 1992. It is not clear how many inmates have remained in general population for a significant period of time after being released from the DDU.

 These holes are apparently designed to facilitate communication through the cell door.

 It appears from the Amended Complaint that defendant Edwin Doolin (“Doolin”) serves as Captain of the DDU.

 Hanson assumed this post in January, 1992, but since January, 1996, has been employed by the Division of Medical Assistance. Hanson testified at her deposition that she is the person most knowledgeable about DMH compliance with G.L.c. 127, §39. According to Hanson’s affidavit, Elias delegated the responsibility of ensuring DMH compliance with G.L.c. 127, §39 to her some time during the first half of 1994 but Hanson has not informed Elias of the details of her efforts to effect compliance.

 For example, the parties could agree that evidence as to persons other than those named plaintiffs still in the DDU would be admissible when relevant to prove the existence of the alleged unlawful practices or procedures that the plaintiffs claim have adversely affected them. Williams v. Secretary of the Executive Office of Human Services, 414 Mass. 551, 554, n.4 (1993).

 According to the affidavit of Dr. Richard Vinnaco, a CMS psychologist, CMS has taken steps to rectify the problems identified in the NAN report.

 Hanson did write a letter to Kathleen Dennehy in which she wrote, “At this time, DMH does not have any recommendations for changes needed in the provision of . . . services. DMH would, however, encourage DOC to review [NAN’s] comments about areas in which there might be improvement in the delivery of mental health service, and take actions as it deems appropriate.”

 The plaintiffs’ Amended Complaint, while long on factual assertions (pars. 1-95), is remarkably inartful and confusing in describing its legal contentions (Counts I through XIII), and in associating the alleged facts with specific causes of action.

 Edward Brennan, Warden, et al.

 None of the plaintiffs currently housed in the DDU is HIV-positive. Bean Affidavit, Ex. 8, at 29, 82-86. See n.9, supra

 The cell extraction, as described by Robinson in his affidavit, seems to pass Constitutional muster. Complaints against individual prison guards may be addressed in a different cause of action.

 According to the statute, an isolation unit “must provide light, ventilation and adequate sanitary facilities, may contain a minimum of furniture, and shall provide at least one full meal daily.” G.L.c. 127, §40.

 Plaintiffs’ evidence that some inmates have exhibited signs of mental disturbances as a result of their DDU confinement represents only a small percentage of the men who have been confined in the DDU.

 It is noteworthy that the Legislature defined isolation in terms of the conditions of confinement and not in terms of the effect of such confinement. See G.L.c. 127, §40 par. 2.

 The thrust of the decision was that although DSU classification is not a means of discipline, because “the reality usually is experienced as restriction and discipline . . . Departmental segregation, with an impact which may well exceed that of a disciplinary proceeding, ought to be governed by procedures which require no less than that required in a disciplinary hearing.” Hoffier at 23.

 Neither plaintiffs nor defendants have addressed the allegation in Count V that the DOC defendants have violated G.L.c. 127, §39. In addition to mandating the conditions of segregated units, G.L.c. 127, §39 provides the process by which an inmate may be transferred to such a unit. This procedure is not that which is utilized to sentence an inmate to the DDU, however.

 It is unclear what policy, other than that which forbids inmates from having educational materials in their cells, plaintiffs are challenging in Counts VI and VII. The only prayer for injunctive relief which relates to these counts asks that “DDU prisoners [be allowed] access to educational materials in their cells.” Further, this issue is the only one pressed by the plaintiffs with respect to these counts despite the fact that the defendants have also raised the DOC’s ban on inmate-to-inmate correspondence, the restrictions on DDU inmates’ participation in rehabilitative and educational programs, the ban on contact visits, and the ban on correspondence courses and textbooks. Because the defendants’ evidence that these policies have legitimate penological purposes remains unrebutted, they are entitled to summary judgment to the extent that these policies are at issue.

 The four factors are: (1) whether there is a valid, rational, connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether the inmates may exercise the right through alternative means; (3) the impact accommodation of the right would have on guards, other inmates, and the allocation of resources; (4) the absence of ready alternatives. Lovell v. Superintendent, North Central Correctional Institution, 26 Mass.App.Ct. 35, 38 n.6 (1988), citing Turner, 482 U.S. at 89-91.

 Plaintiffs also contend that they are entitled to equitable relief to ensure DOC compliance with 105 Code Mass. Regs. 451.212. Injunctive relief is not appropriate based on a speculation about a future violation.

 During its tour of the DDU in May, 1996, the court observed that the units’ outdoor exercise area consisted of a series of long and narrow, ‘dog run’, type enclosures, surrounded on the top and all sides by chain-link type fencing, and with no solid roof or other covering sufficient to permit inmates to exercise there in inclement weather.

 There is also a genuine issue of material fact regarding whether DDU prisoners are frequently forced to choose between going to counseling sessions and exercise.

 Even if plaintiffs demonstrate that defendants violated their rights under 105 Code Mass. Regs. 451.212 during inclement weather and by scheduling counseling sessions, the State Civil Rights Act would not apply because there was no threats, intimidation, or coercion involved and §1983 would not apply because this is not a Federally guaranteed right.

 Parkinson claims that he was unable to challenge his federal bank robbery conviction. Almeida maintains that he was unable to file a complaint regarding a disciplinary proceeding. Chase asserts that he could not file a claim against DOC relating to inadequate health care. MacDougall states that he was unable to pursue an appeal after losing a Superior Court action arising from his deprivation of contact visits. MacDougall also claims injury in that the Probate and Family Court ruled adversely to him in a matter involving the surname of his son. This latter injury is irrelevant because resources on family law are not “[t]he tools . . . that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.” Lewis, 116 S.Ct. at 2182.

 Plaintiffs have not alleged violations of the State and Federal Civil Rights Acts by the DMH defendants.

 Plaintiffs have not argued that other rights at issue were clearly established. The DOC defendants would be entitled to summaiy judgment on the basis of qualified immunity with respect to the particular instances of excessive force, inadequate health care, etc., because the defendants had no personal involvement in these events and there is no evidence that they intentionally failed to fulfill their statutory duties. O'Malley, 415 Mass. at 142-43. Further, although Maloney heard the inmates’ appeals from the DDU sentences, plaintiffs have not alleged any wrongdoing in this respect.

 Contrast Monell v. Dept. of Social Services of New York, 436 U.S. 658 (1978) (municipal liability under §1983); Broderick v. Roache, 803 F.Supp. 480, 484-85 (D.Mass. 1992) (municipal liability under G.L.c. 12, §§11H and 1II). But see ELM, 33 Mass.App.Ct. at 76 n. 8 (“We express no opinion with regard to the immunity ... of municipalities . . . under the State Civil Rights Act").

 Indeed, both Almeida and MacDougall have previously brought actions in the Superior Court alleging due process violations in other disciplinary proceedings.

 “Inmates challenging alleged improprieties in prison disciplinary proceedings under State law must proceed by way of an action in the nature of certiorari.” Pidge v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 32 Mass.App.Ct. 14, 17 (1992). “Certiorari actions must be commenced within sixty days after the conclusion of the proceeding being challenged . . . Failure to do so is such a ‘serious misstep’ that such an action must be dismissed when not timely filed, even if the defendants fail to plead the statute of limitations as an affirmative defense.” Pidge, 32 Mass.App.Ct. at 17, 18. “[A] State cannot apply a shorter time limit, such as the sixty-day period of G.L.c. 249, §4, to a substantive Federal right properly asserted in a State court.” Pidge, 32 Mass.App.Ct. at 19.

 DDU inmates may not earn good time credits. But because awarding good time credits is discretionary, see G.L.c. 127, §129D, no liberty interest is involved. See MacDougall v. Dubois, Civil No. 93-3032-D, 2 Mass. L. Rptr. 294 (Middlesex Super. Ct. Jun. 27, 1994).

 The adequacy of the procedure afforded these inmates will, of course, be scrutinized according to the Federal due process requirements enunciated in Wolff, 418 U.S. at 563-70: (1) an inmate must be given at least twenty-four hours advance notice of the charges; (2) there must be a written statement, by the factfinders, of the reasons for the disciplinary action and the evidence upon which they relied; and (3) an inmate must be allowed to present witnesses and documentary evidence in his defense if this is not unduly hazardous to institutional safety or correctional goals; (4) but an inmate need not be afforded the right to confrontation, cross-examination, or counsel. If these three plaintiffs demonstrate that defendants denied them the opportunity to call witnesses, defendants may justify this action at trial. See Smith, 936 F.2d at 1399. See also Ponte v. Real, 471 U.S. 491 (1985), vacating Real v. Superintendent, Massachusetts Correctional Institution, Walpole, 390 Mass. 399, 406 (1983).

 103 Code Mass. Regs. 430.11 provides, in pertinent part, “(2) The disciplinary officer shall schedule a hearing before a hearing officer within a reasonable time, but not less than 24 hours after the inmate has been served with both the disciplinary report and the notice specifying the time of hearing. The disciplinary officer or hearing officer may continue a hearing at his discretion. The inmate shall be entitled to one continuance for good cause provided that any request for a continuance must ordinarily be made at least 24 hours prior to the scheduled time of the hearing.”

 Plaintiffs have not argued that the regulations violate their rights under the Equal Protection Clause. This court therefore need not and will not address this issue.

 Plaintiffs Jerell Bunce and Adrian Almeida, now known as Jafar Omar Munir, maintain that they were not given an opportunity to appear at disciplinary hearings charging violations while they were already confined to the DDU and, contrary to the reports of the hearings, they did not refuse to appear. See 103 Code Mass. Regs. 430.11(3) and 430.14(2). As a result of these hearings, Bunce lost yard privileges and visits and Almeida received seven days in isolation. Bunce also asserts that at another proceeding which resulted in his DDU sentence, he was not allowed to make a statement. See 103 Code Mass. Regs. 430.12(3). Plaintiff Mark MacDougall *407 asserts that, while he was serving a DDU sentence, he requested the appearance of a corrections officer to testify at a disciplinary hearing which resulted in an additional two-year DDU sentence. The officer did not appear and the report generated from the hearing falsely indicated that MacDougall did not request witnesses. See 103 Code Mass. Regs. 430.11(5).

 An action under G.L.c. 249, §4 must be brought within sixty days of Maloney’s denial of plaintiffs’ appeal. Defendants have produced evidence that this action was filed more than sixty days after the final decision of Deputy Commissioner Maloney in all of the plaintiffs’ disciplinary proceedings. Each of the eleven plaintiffs appealed a decision assigning him to the DDU to the Commissioner of DOC between May 20, 1992 and August 24, 1993 pursuant to 103 C.M.R. 430.18(3). (McCrosson Aff. par. 6 at 3 (March 18, 1993).)

 Plaintiffs also challenge the disciplinary procedures used “in imposing disciplinary measures once in the DDU,” Amended Complaint, pars. 138 and 141, and allege that “if a corrections officer arbitrarily chooses to classify a prisoner’s infraction as ‘major/ the prisoner will not receive credit for the prior month served towards his DDU sentence.” Amended Complaint, par. 43. The Amended Complaint was not verified; therefore, the allegations contained therein have no evidentiary weight. Godboutv. Cousens, 396 Mass. 254, 262 (1985). Moreover, plaintiffs only seek declaratory and injunctive relief with regard to the procedure utilized to sentence them to the DDU. See Amended Complaint, at 36 pars. 5 and 6; 38 pars. 14 and 15. The regulations controlling disciplinary procedures appear to apply to hearings for those already serving DDU sentences as well as to the remainder of the prison population.